980 P.2d 701 (1999)
138 Wash.2d 413
AVIATION WEST CORPORATION, Competition Specialties, Inc., Computer Group, Inc., the American Tobacco Company, Brown and Williamson Tobacco Corporation, Lorillard Tobacco Company, R.J. Reynolds Tobacco Company, and Phillip Morris, Inc., Appellants,
v.
WASHINGTON STATE DEPARTMENT OF LABOR AND INDUSTRIES and Mark Brown, Director, Respondents.
No. 66574-5.
Supreme Court of Washington, En Banc.
Argued November 18, 1998.
Decided July 8, 1999.
*702 Heller, Ehrman, White & McAuliffe, Timothy Harold Butler, Andrew Michael Kenefick, Seattle, Covington & Burling, Clausen Ely, Jr., Washington, DC, for Appellant Aviation West Corporation.
Christine O. Gregoire, Atty. Gen., Elliott S. Furst, Asst., Olympia, for Respondent Department of Labor & Industries and Mark Brown.
ALEXANDER, J.
Five major cigarette manufacturing companies and three Washington businesses (hereinafter Companies) brought an action for declaratory judgment and injunctive relief in Thurston County Superior Court against the State of Washington, arguing that a regulation adopted by the Department of Labor and Industries (Department) regulating smoking in private workplaces was invalidly promulgated. The trial court upheld the Department's regulation. The Companies thereafter appealed the decision of the Superior Court to the Court of Appeals, Division Two, which, in turn, certified the case to this court for direct review. We granted review and now affirm the trial court.
On November 3, 1993, the Department filed proposed indoor air quality regulations. One of the proposed regulations was aimed at eliminating environmental tobacco smoke (ETS)[1] exposures in private workplaces. Following that filing the Department received extensive written comments on their proposal and conducted six public hearings. The Companies presented testimony at the hearings and submitted voluminous written materials concerning the alleged adverse health effects of workplace ETS exposures. Although the Department decided to not promulgate the other proposed indoor air quality regulations,[2] the ETS regulation was issued in final form on March 16, 1994 unchanged from its proposed form in any respect material to this case. An accompanying *703 Concise Explanatory Statement (CES) indicated why the Department adopted the regulation.
On June 23, 1994, the Joint Administrative Rules Review Committee (JARRC), comprised equally of some state senators and representatives, reviewed the ETS regulation and by a two-thirds majority vote recommended its suspension because it "goes beyond the Department's statutory authority." Clerk's Papers (CP) at 123. After another public hearing the Department rejected JARRC's recommendation.
The Companies then filed an action for declaratory judgment and injunctive relief in Thurston County Superior Court. The filing was soon followed by their motion for summary judgment. They asserted in their motion, among other things, that the Department violated the Washington Administrative Procedure Act (APA), RCW 34.05, and also failed to meet the two-part "significant risk" test enunciated in Industrial Union Dep't v. American Petroleum Inst., 448 U.S. 607, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980) (plurality opinion) [hereinafter Benzene ] that the Companies alleged was required under the Washington Industrial Safety and Health Act (WISHA), RCW 49.17. The trial court denied the motion. The Companies then renewed the motion, indicating that they had new evidence of the Department's alleged failure to comply with Benzene. They also moved to exclude any supplemental trial testimony by Department officials. The trial court denied these motions.
A bench trial was held in early 1996. At trial, the Department submitted its CES, which stated that its risk assessment was based upon an Environmental Protection Agency (EPA) report, as well as "reports issued by the Surgeon General of the United States, the National Research Council, and other studies." AR 58: 34,449.[3] The Department's then-director, Mark Brown, testified at trial and identified a National Institute of Occupational Safety and Health report, as well as a joint report from the Fred Hutchinson Cancer Center and the Washington Department of Health, as also forming a basis for the Department's decision to promulgate the ETS regulation. Brown admitted that the Department did not run an independent statistical analysis on these reports, nor set out its own threshold for "significant risk." Report of Proceedings (RP) at 157.
The trial court upheld the ETS regulation in an oral ruling, following that with an order on July 22, 1996, in which it dismissed the Companies' petition. The Companies appealed to the Court of Appeals, Division Two, which certified the appeal to this court for direct review. The certification was accepted.[4]

ANALYSIS
1. Was the Department required under the APA to explain its complete rationale for the ETS regulation in the administrative record?
The Companies' contend that the trial court erred in concluding that the Department was not required to confine its rationale for the ETS regulation to materials within the administrative record. The Department responds that it satisfied the then-minimal requirements for a CES, and that, in any event, the regulation's rationale was adequately explained through a combination of both the CES and supplemental trial testimony.
We note at the outset of our discussion of this issue, that the APA's then-existing requirement for a CES must be distinguished from the requirement for a rule-making file. It is undisputed that the size of *704 the record in this case, which fills 15 boxes,[5] is quite irrelevant to the question of whether the Department fulfilled its statutory obligation to explain the ETS regulation's rationale. One administrative law professor has written that "the record is merely a compilation of the material considered by the agency in the rulemaking. It can be likened to a big cardboard box into which copies of things considered are thrown." William Funk, Rationality Review of State Administrative Rulemaking, 43 ADMIN. L. REV. 147, 166 (1991). For our purposes the essential content of the voluminous rule-making file in this case are the few pages that comprise the CES.
At the time the ETS regulation was adopted, the statutory requirement for a CES, RCW 34.05.355, repealed by Laws of 1995, ch. 403, § 305 [hereinafter RCW 34.05.355 (1992) ], read as follows:
(1) At the time it files an adopted rule with the code reviser or within thirty days thereafter, an agency shall place into the rule-making file maintained under RCW 34.05.370 a concise explanatory statement about the rule, identifying (a) the agency's reasons for adopting the rule, and (b) a description of any difference between the text of the proposed rule as published in the register and the text of the rule as adopted, other than editing changes, stating the reasons for change.
Appellants strain to import a federal standard of review into this state APA case. With regard to the CES requirement they try to read into it the requirements imposed under federal administrative law cases by taking issue with the fact that the trial court admitted the testimony of Department witnesses to supplement the rationale provided in the CES.[6] However, the practice of admitting such testimony was clearly envisioned at the time of the APA's adoption. Indeed, Professor William Andersen, a member of the task force that proposed the APA to the Legislature, lamented the absence of a stricter judicial review standard:
The Model Act wisely included a provision that limited justification of rules on judicial review to reasons contained in the agency's concise general statement. The purpose of such a restriction is to ensure that reasons and justifications were part of the agency deliberative process and not the post hoc rationalizations of agency lawyers or judges....
... Unfortunately, such a provision was not proposed for inclusion in the new Act [the Washington APA]. It is to be hoped that the legislature will correct this oversight at an early date....
William R. Andersen, The 1988 Washington Administrative Procedure Act  An Introduction, 64 WASH. L.REV. 781, 803-04 (1989) (emphasis in second paragraph added) (footnotes omitted). In fact, the APA specifically provides that the trial court is permitted to take additional evidence where needed to "decide disputed issues regarding ... [u]nlawfulness of procedure or of decision-making process." RCW 34.05.562(1)(b).
We believe the Companies misunderstand Neah Bay Chamber of Commerce v. Department of Fisheries, 119 Wash.2d 464, 832 P.2d 1310 (1992), which they cite as authority forbidding what this court and statute expressly allow. In Neah Bay we indicated that while "additional evidence of an agency's reasoning and the background materials relied upon may be presented on review, such evidence is only admissible to explain the agency's decision at the time." Neah Bay, 119 Wash.2d at 474-75, 832 P.2d 1310 (citation omitted). Moreover, a distinguishing fact in Neah Bay cannot be stressed enough: there the Department of Fisheries had failed to *705 present any administrative record as required by the APA. "Because there was no record presented of what actually went into the Department's regulations ... it is impossible to say whether they were rational or irrational." Neah Bay, 119 Wash.2d at 475, 832 P.2d 1310. Instead, the trial court "relied solely on deposition and other testimony of experts which was not contemporaneous with the rule-making process." Neah Bay, 119 Wash.2d at 475, 832 P.2d 1310. Although admissible, this was not enough, because it could obviously only "supplement, not replace, the administrative record." Neah Bay, 119 Wash.2d at 475, 832 P.2d 1310.
The Companies also rely heavily upon Inland Foundry Co. v. Spokane County Air Pollution Control Auth., 82 Wash.App. 67, 915 P.2d 537 (1996), review denied, 131 Wash.2d 1025, 937 P.2d 1101 (1997), for the blanket proposition that an agency must, under the APA, "provide a clear explanation of its reasons for issuing a workplace standard which demonstrates that it considered the proper legal factors and that it rationally reviewed and analyzed the pertinent evidence." Appellants' Br. at 12. This is a misinterpretation of the holding. Inland Foundry involved a municipal corporation, which was "not governed by RCW 34.05.370(1)"the APA requirement for maintaining a rule-making file. Inland Foundry, 82 Wash.App. at 71 n. 5, 915 P.2d 537. However, in promulgating regulations it was required to make "special reference to effects on health, economic and social factors, and physical effects on property." Inland Foundry, 82 Wash.App. at 70, 915 P.2d 537 (quoting RCW 70.94.151). This it did not do, instead failing "to make any rule-making information available." Inland Foundry, 82 Wash.App. at 71 n. 5, 915 P.2d 537 (emphasis added). Inland Foundry is simply too factually dissimilar to the instant case to stand for the proposition that the Companies cite it for. In fact, as in Neah Bay, the court in Inland Foundry did write that "post-enactment support may supplement an administrative record," although, of course, "it cannot replace it." Inland Foundry, 82 Wash.App. at 71 n. 5, 915 P.2d 537.
The Companies overlook the following language from the APA as it existed at the time the ETS regulation was adopted: "Upon the request of any interested person within thirty days after adoption of a rule, the agency shall issue a concise statement of the principal reasons for overruling the considerations urged against its adoption." RCW 34.05.355(2) (1992). The Companies did not make this request in the period provided. Rather, they sat on their rights when they had the opportunity to assert them and essentially now fault the Department for not answering a question that it was never asked.
In effect, what the Companies seem to be arguing for is an application of the APA as it currently exists to a rule promulgated prior to some "regulatory reform" changes in the APA. It was only following the adoption of the ETS regulation in 1994 that the language of the APA was amended to provide that before an agency adopts a final rule it shall summarize all comments received by the agency and respond to the comments by content or subject matter, "indicating how the final rule reflects agency consideration of the comments, or why it fails to do so." Laws of 1994, ch. 249, § 7(6). The Legislature even expressly provided that this change "applies prospectively only and not retroactively." Laws of 1994, ch. 249, § 36.
Thus no retroactive application is possible. Regardless, why would this change have been made if, to follow the Companies' argument, it was redundant to that which was already required? "It is presumed that the legislature does not deliberately engage in unnecessary or meaningless acts." Knowles v. Holly, 82 Wash.2d 694, 704, 513 P.2d 18 (1973) (citing Roza Irrigation Dist. v. State, 80 Wash.2d 633, 497 P.2d 166 (1972)). Moreover, even today, as was true in 1994, "the official agency rule-making file need not be the exclusive basis for agency action on that rule." RCW 34.05.370(4).
Even the Companies do not argue that the Department's witnesses offered explanations for the ETS regulation beyond explaining why they made the "decision at the time." Neah Bay, 119 Wash.2d at 475, 832 P.2d 1310 (emphasis added). The Department's witnesses did not offer, for example, *706 truly "post hoc" evidence such as studies reported after the regulation was adopted. Accordingly, even assuming that the Companies are correct and the CES was not adequate to support the ETS regulation, admitting testimony to establish the regulation's basis was obviously permissible. That brings us to the next step: "[T]he general rule is that a superior court's findings are not relevant in appellate review of an agency action; however, where the superior court takes additional evidence ... the appellate court will look to the superior court record." Seattle Bldg. & Constr. Trades Council v. Apprenticeship & Training Council, 129 Wash.2d 787, 799, 920 P.2d 581 (1996) (citation omitted).
In sum, we conclude that the Department was not required at the time of the ETS regulation's adoption to explain its complete rationale in the administrative record, and that the testimony of the Department's officials was properly admitted to supplement the CES.
2. Did the Department satisfy its statutory requirements under the WISHA in promulgating the ETS regulation?
The Companies argue next that the trial court erred in concluding that the Department had satisfied its statutory obligations under the WISHA in promulgating the ETS regulation. Under WISHA, as it existed at the time the ETS regulation was adopted, the Department had the authority to promulgate "safety and health standards" that were "reasonably necessary or appropriate to provide safe or healthful employment and places of employment." RCW 49.17.020(6) (1992). The Companies admit that the "reasonably necessary or appropriate" requirement has not been addressed by the Washington courts, but note that "safety and health standards" are defined identically in the federal Occupational and Safety Health Act (OSH Act). Appellants' Br. at 16 (citing 29 USC § 652(8)). Accordingly, the Companies urge us to rely upon the two-part "significant risk" test adopted in a plurality opinion by the United States Supreme Court in Benzene.
In Benzene the Court struck down an Occupational Safety and Health Administration (OSHA) standard limiting occupational exposure to benzene, holding that under the OSH Act before any "health and safety standard" was promulgated it must be determined that, first, there is "a significant risk of material health impairment" and that, second, the regulation is "reasonably necessary and appropriate to remedy" it.[7]Benzene, 448 U.S. at 639, 100 S.Ct. 2844. Then-Justice Rehnquist concurred in the result only, reasoning that the power to promulgate such a standard never should have been delegated from Congress to the OHSA in the first place. Benzene, 448 U.S. at 608, 100 S.Ct. 2844 (Rehnquist, J., concurring in the result) ("[H]ard choices ... must be made by the elected representatives of the people.") (emphasis added). Thus he did not pass on the two-part "significant risk" test adopted by four of his colleagues. Indeed, quite contrary to the Companies' assertion, it appears that a majority of the Court has never adopted this test, but has instead merely noted that OSHA itself has adopted it. See American Textile Mfrs. Inst., Inc. v. Donovan, 452 U.S. 490, 505 n. 25, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981). Ultimately, however, in light of our disposition of this case the question of the "significant risk" test's acceptance by the Court and other courts is simply irrelevant.
Standards adopted under the WISHA "shall equal or exceed" the OSH Act standards. RCW 49.17.010 (emphasis added). They must be "at least as effective as those adopted or recognized" under the OSH Act. RCW 49.17.050(2) (emphasis added). Thus, they can be more protective, although not less, of worker safety than rules promulgated under the OSH Act. However, the *707 OSHA has not even adopted any ETS regulations. Thus there is no relevant federal standard to "equal or exceed." RCW 49.17.010. Accordingly, the Companies citation to wholly unrelated federal OSH Act cases provides us little guidance. Moreover, even if the word "exceed" could be read out of the WISHA, and the standard for worker protections was just "equal" under both statutes, "[i]t is well settled that the Supreme Court's construction of a similarly worded federal statute, although often persuasive, `is not controlling in our interpretation of a state statute.'" Hoffer v. State, 113 Wash.2d 148, 151, 776 P.2d 963 (1989) (quoting State v. Gore, 101 Wash.2d 481, 487, 681 P.2d 227, 39 A.L.R.4th 975 (1984)) (additional citations omitted). Thus we are by no means bound by the Benzene test.
Further distinguishing Benzene is that the liquid regulated there "is a familiar and important commodity .... used in manufacturing a variety of products including motor fuels ... solvents, detergents, pesticides, and other organic chemicals." Benzene, 448 U.S. at 615, 100 S.Ct. 2844. Roughly "11 billion pounds of benzene were produced in the United States in 1976," and the Court noted that "[b]ecause of benzene's importance to the economy, no one has ever suggested that it would be feasible to eliminate its use entirely, or to try to limit exposures to the small amounts that are omnipresent."[8]Benzene, 448 U.S. at 615, 637, 100 S.Ct. 2844. In contrast, as the Department notes, "[t]obacco smoke is not needed to produce any product or service by any business in this state." Resp'ts' Br. at 30. Even the Companies cannot argue that there is any benefit to ETS. "[U]nlike benzene, ETS is not indispensable to any job and, therefore, there is less reason to avoid banning it completely in the workplace." Fogle v. H & G Restaurant, Inc., 337 Md. 441, 654 A.2d 449, 458 n. 8 (1995).
Even assuming that the Benzene test was applied,
imposing a burden on the Agency of demonstrating a significant risk of harm will not strip it of its ability to regulate carcinogens, nor will it require the Agency to wait for deaths to occur before taking any action. First, the requirement that a "significant" risk be identified is not a mathematical straitjacket. It is the Agency's responsibility to determine, in the first instance, what it considers to be a "significant" risk....

Second, OSHA is not required to support its finding that a significant risk exists with anything approaching scientific certainty. Although the Agency's findings must be supported by substantial evidence... so long as they are supported by a body of reputable scientific thought, the Agency is free to use conservative assumptions in interpreting the data with respect to carcinogens, risking error on the side of overprotection rather than underprotection.

Benzene, 448 U.S. at 655-56, 100 S.Ct. 2844 (emphasis added) (footnote omitted). The Benzene plurality noted that "[w]e express no opinion on what ... factual determinations would warrant a conclusion that significant risks are present which make promulgation of a new standard reasonably necessary or appropriate." Benzene, 448 U.S. at 659, 100 S.Ct. 2844. It did, however, opine that a fatality risk of one in a billion "clearly" would not be significant, while a risk of one in a thousand "might" be. Benzene, 448 U.S. at 655, 100 S.Ct. 2844. The Court apparently accepted industry testimony that "current exposure levels [to benzene] would cause at most two deaths out of ... 30,000 workers every six years." Benzene, 448 U.S. at 654, 100 S.Ct. 2844.
Under the WISHA, the Department must base workplace exposure standards upon "the best available evidence." RCW 49.17.050(4). Here the Department stated in its CES that it based its risk assessment upon an EPA report, as well as "reports issued by the Surgeon General of the United States, the National Research Council, and other studies." AR 58: 34,449. In his testimony *708 the Department's then-director, Mark Brown, also identified a National Institute of Occupational Safety and Health (NIOSH) report, as well as a joint report from the Fred Hutchinson Cancer Center and the Washington Department of Health, as contributing to the decision to promulgate the ETS regulation. Brown conceded that the Department did not run an independent statistical analysis on these reports nor set out its own threshold for significant risk. He explained that "[w]e wouldn't want to waste our time and money duplicating the effort of another public agency." Verbatim Report of Proceedings (RP) at 115. Choosing to not "reinvent the wheel" and instead relying upon existing ETS studies that are directly on point appears to us to be a reasonable decision, and the Companies cannot point to a case explaining why the Department should not be able to make it.[9] After all, to use an example, assuming that ETS is deleterious to the healthy workers in one state it would defy logic to argue that it does not have the same effect in another.
In contrast to the two deaths every six years that were estimated to result in the absence of the regulation at issue in Benzene, the 1992 EPA report relied upon by the Department, Respiratory Health Effects of Passive Smoking: Lung Cancer and Other Disorders, quantifies risk and estimates that ETS causes 3,000 lung cancer deaths annually among United States nonsmokers based on data from 11 epidemiological studies of women who never smoked but were married to smoking spouses. The report notes that "[w]orkplace ETS levels are generally comparable with home ETS levels," with an estimated 2,200 deaths due to nonspousal exposures. AR 49: 30,275. It "does not develop an analysis of ... the heart disease data." AR 49: 30,267. Although the report does not clearly recommend government regulation of smoking, Maryland relied upon it in adopting its own regulation relating to ETS. Fogle, 654 A.2d at 453.
The Companies cite a recent case in which a United States District Court in North Carolina "vacated" portions of the EPA report due to what it found to be procedural and methodological flaws. Flue-Cured Tobacco Coop. Stabilization Corp. v. United States Envtl. Protection Agency, 4 F.Supp.2d 435 (M.D.N.C.1998), appeal filed, No. 6:93CV370 (4th Cir. Sept. 15, 1998). This decision is on appeal. However, even if the District Court is correct, and the EPA report is flawed, the Department rule-making built atop it four years earlier would not, as appellants apparently suggest, collapse like a house of cards. Regulations are not that tenuous. The standard under our state's APA is whether the choice to rely upon the EPA report was rational at the time it was made. "The court must scrutinize the record to determine if the result was reached through a process of reason, not whether the result was itself reasonable in the judgment of the court." Neah Bay, 119 Wash.2d at 474, 832 P.2d 1310 (emphasis added); see also Flue-Cured Tobacco Coop., 4 F.Supp.2d at 455 ("A risk assessment, by its very nature, is not a final determination about the health effects of a substance but is instead an assessment that makes the best judgments possible based upon the available evidence.") (emphasis added) (citation omitted). Accordingly, this federal case is not dispositive. Regardless, then-Director Brown testified that the EPA report is not the sine qua non of the support for the ETS regulation: "In the single absence of the EPA report, I think there's plenty left to support a rational decision maker reaching *709 the decision and conclusion I made with EPA as part of the foundation." RP at 150. Without question, however, the EPA report would appear to be the firmest basis for the regulation among the reports cited in the CES and by then-Director Brown in his testimony.
The 1991 NIOSH report, Environmental Tobacco Smoke in the Workplace: Lung Cancer and Other Health Effects, summarizes studies exploring the link between ETS, cancer and heart disease, and concluded that "ETS poses an increased risk of lung cancer and possibly heart disease to occupationally exposed workers." AR 49: 30,077. Although the report did not quantify the significance of the risk, it recommended that tobacco use either be eliminated in the workplace or that smoking occur only in enclosed, separately ventilated areas.
The 1990 joint report from the Fred Hutchinson Cancer Research Center and the Washington Department of Health, Smoking in Washington State: Status of the Problem and Recommendations for Intervention, offers what the report acknowledges is only "a crude and possibly conservative estimate of excess mortality from passive cigarette smoke exposure" of 89.5 lung cancer deaths in Washington. AR 53: 32,524. This figure is not broken down between homes and workplaces. However, it does appear to be quite rational for the Department to conclude, as the report indicates, that "a large percentage of the 89.5 lung cancer deaths in Washington per year would be work-related." Resp'ts' Br. at 40-41.
The 1986 National Research Council, Environmental Tobacco Smoke: Measuring Exposures and Assessing Health Effects, surveyed studies and found that "[t]he best estimate, allowing for reasonable misclassification, is that the adjusted risk of lung cancer is increased about 25% ... in nonsmokers married to smokers compared with nonsmokers married to nonsmokers." AR 57: 34,164. No firm conclusions could be drawn about the risk that ETS might pose to the heart. Moreover, because "[o]nly studies that assess exposures under experimental conditions or in the home are included" in the report, the implications of ETS for the workplace environment were not subject to any statistical risk discussion. AR 57: 33,945.
The 1986 Surgeon General's report, The Health Consequences of Involuntary Smoking, reviewed studies conducted on the health consequences of ETS. Although it concludes that "[i]nvoluntary smoking is a cause of disease, including lung cancer, in healthy nonsmokers" (AR 52: 32,173) it adopts no statistical measure of risk itself: "[A]dditional data on the distribution of smokers in the nonsmokers' environment, as well as the distribution of ETS levels in that environment, are needed in order to characterize the actual ETS exposure of the U.S. population." AR 52: 32,301 (emphasis added).
While none of the reports just described advocated the type of ETS regulation that is at issue here, they clearly provided evidence from which a reasonable conclusion could be drawn that such a regulation is necessary to protect worker health. Because it encompassed the most current data the EPA report appears to have been the "the best available evidence." RCW 49.17.050(4). How can it be reconciled, however, with the Companies' position? The United States Supreme Court has written in another OSH Act case that "[t]he reviewing court must take into account contradictory evidence in the record, but `the possibility of drawing inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" American Textile Mfrs. Inst., 452 U.S. at 523, 101 S.Ct. 2478 (quoting Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966)). Similarly, the District of Columbia Circuit Court of Appeals has written that "the court must not second-guess the particular way the agency chooses to weigh the conflicting evidence or resolve the dispute." United Steelworkers of Am. v. Marshall, 647 F.2d 1189, 1263 (D.C.Cir. 1980); see also Fogle, 654 A.2d at 458 ("We do not second guess the judgmental basis upon which the agency chose to weigh the conflicting evidence."). We have held that "[s]ubstitution of our judgment for that of the administrative agency in factual matters is not authorized by the APA and ... we will *710 not try facts de novo on review." Franklin County Sheriff's Office v. Sellers, 97 Wash.2d 317, 325, 646 P.2d 113 (1982).
The fact that the EPA report "included no workplace studies," Appellants' Reply Br. at 23, is not determinative. The trial judge noted that the evidence
was sufficient to justify the Department's rationale ... that the link between ETS and spousal studies would be at least the same, if not greater than the ETS exposure in the workplace, given the probability that there would be more smokers in the workplace than there would be generated by one particular spouse and that the period of time would certainly be as much on general terms of exposure as would be experienced in the home, and the ability to be separate from one conducting a smoking activity would be perhaps in certain occasions, more limited than that available to a non-smoker in the home.
And, regardless, ... I don't know whether or not the Department's view or the view of the studies relied upon by the Department is ultimately the best. It's not for me to make that judgment.

RP at 822-23 (emphasis added).
The Companies cite "two major spousal studies," whose lead authors were Ross Brownson and Heather Stockwell, as comprising some of the evidence best supporting their position. See Appellants' Br. at 54. However, even these studies contain sufficient support for the Department's position, with the Brownson study also being included as evidence "in the Department's portion of the rulemaking file," Resp'ts' Br. at 59 (emphasis added), to make them, at best, ambiguously supportive of the Companies' position. The concluding sentence of Brownson's study, for example, reads as follows: "The proliferation of federal, state, and local regulations that restrict smoking in public places and work sites is well founded." AR 57: 34,259 (footnote omitted); Ross C. Brownson et al., Passive Smoking and Lung Cancer in Nonsmoking Women, 82 AM. J. PUB. HEALTH 1525, 1529 (1992) (footnote omitted). It is difficult to even characterize such evidence as "conflicting," let alone question the Department for resolving any conflict in the manner it did.[10] As the trial judge noted: "There is not that quantum of evidence which results in the necessary conclusion that the science is more probably than not the way the plaintiffs argue it as opposed to the department." RP at 823. The only question then becomes whether the Department was required to quantify, in its CES, the risk posed by ETS. In addressing this particular question it is appropriate to turn to guidance from another state court confronted with it:
[T]here was a sufficient foundation in the record to support the Commissioner's conclusion that, on the present state of evidence, it is impossible to set a safe level of ETS because no such safe or threshold level is now known at which ETS would not pose a health hazard to Maryland employees, or which can be easily ascertained through current scientific knowledge; and, if one could be ascertained, it would be so low that it would be meaningless from a regulatory perspective.
Fogle, 654 A.2d at 458. It is significant, as the Department asserts, the Companies do not cite a single case in which a state has actually quantified "significant risk" under a state plan similar to the OSH Act.
*711 Under the WISHA, in language mirroring that of the OSH Act, the Department's director was required to establish an ETS regulation "which most adequately assures... that no employee will suffer material impairment of health or functional capacity even if such employee has regular exposure to the hazard dealt with by such standard for the period of his working life." RCW 49.17.050(4) (emphasis added). We agree with the dissent in Benzene that the "significant risk" test in the plurality opinion there "renders utterly superfluous" this standard-setting language, and that "it is an odd canon of construction that would insert in a vague and general definitional clause a threshold requirement that overcomes the specific language placed in a standard-setting provision." Benzene, 448 U.S. at 709, 100 S.Ct. 2844 (Marshall, J., dissenting); see also Knowles, 82 Wash.2d at 702, 513 P.2d 18 ("[W]here there is a conflict between one statutory provision which deals with a subject in a general way and another which deals with the same subject in a specific manner, the latter will prevail.") (citing State ex rel. Phillips v. Washington State Liquor Control Bd., 59 Wash.2d 565, 369 P.2d 844 (1962)). Accordingly, while Benzene provides a useful backdrop against which to examine this case, we find that its two-part "significant risk" formulation raises more questions than it provides answers, with its amorphousness creating the risk that judges could use it to impose their own policy predilections, and we do not choose to adopt it for purposes of interpreting WISHA. See Hoffer, 113 Wash.2d at 151, 776 P.2d 963. We agree that "a court is not permitted to distort a statute's meaning in order to make it conform with the Justices' own views of sound social policy." Benzene, 448 U.S. at 688, 100 S.Ct. 2844 (Marshall, J., dissenting) (citing Tennessee Valley Auth. v. Hill, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978)). Whether regulations are reasonable or appropriate is a question for the fact-finder to determine on a case-by-case basis, subject to only limited review by this court. We cannot legislate in order to add to what the Legislature has already said. See Tapper v. Employment Sec. Dep't, 122 Wash.2d 397, 405-06, 858 P.2d 494 (1993). Again, the standard is that "[t]he court must scrutinize the record to determine if the result was reached through a process of reason, not whether the result was itself reasonable in the judgment of the court." Neah Bay, 119 Wash.2d at 474, 832 P.2d 1310 (emphasis added). In any event, common sense would compel a conclusion that it would generally not be "reasonably necessary or appropriate" to regulate an insignificant risk, thus defeating the overwrought hypothetical involving a governmental perfume ban that the Companies offer to illustrate the supposed perils of the Department's regulatory authority. See Appellant's Reply Br. at 15.
It is important to note that the ETS regulation does not entirely ban smoking in private workplaces. Were it to do so it would present a different case than this one. No restrictions, for example, are imposed upon smoking in outdoor workplaces. Furthermore, indoor smoking may still occur if the workplace provides a separately ventilated space for it. WAC 296-62-12005. Ironically, among the materials in the Department's section of the rule-making file is a report from one of the Companies, R.J. Reynolds, stressing the ease with which such a smoking lounge can be established. The report, Developing a Smoking Lounge, notes that "[d]eveloping a smoking lounge need not be expensive or difficult. In many cases, existing rooms or offices can be converted into a smoking lounge with very little time, effort or money." AR 49: 30,086. This seems to be a "feasible" accommodation,[11] RCW 49.17.050(4), and is one recommended by the NIOSH report relied upon by the Department. See AR 49: 30,078. Accordingly, it is only when an employer is unwilling to spend "very little time, effort or money" to protect nonsmoking workers from entirely unnecessary and, thus, entirely avoidable, ETS exposure that smoking is banned indoors.[12] It is *712 curious that the Companies fail to mention this. Instead they create the impression that the ETS regulation is "a complete ban." Appellants' Br. at 31.
To be sure, the CES was no model of comprehensiveness. However, it seems clear to us from the CES and from the testimony of the Department's witnesses that ETS was identified as posing a significant risk to Washington workers, and that even an agency bound by the exacting Benzene test "is not required to support its finding that a significant risk exists with anything approaching scientific certainty." Benzene, 448 U.S. at 656, 100 S.Ct. 2844. The National Research Council report examined the question of whether "there is a threshold dose of cigarette smoke exposure below which there is no increase in risk," and determined that "[b]iological theory and current evidence on low-dose exposure to carcinogens do not provide evidence for such a threshold, and it is generally thought that one is unlikely." AR 57: 34,141 (citation omitted). The industrial hygienist who "was the person primarily responsible for advising the Department" on the ETS regulation declared that he relied upon this conclusion in not establishing a threshold. CP at 1622. Recall that "risking error on the side of overprotection rather than underprotection" is permissible even under Benzene. Benzene, 448 U.S. at 656, 100 S.Ct. 2844. Accordingly, we find that no violation of the WISHA, an act that can be more protective of worker health than the OSH Act, occurred.
In sum, we conclude that the Department satisfied its statutory requirements under the WISHA in promulgating the ETS regulation to address an apparently significant, and wholly unnecessary, risk to worker health.
3. Could the Department's decision to promulgate the ETS regulation have conceivably been the product of a rational decision-maker?
We now turn to a final argument advanced by the Companies, namely that the trial court erred in finding that the ETS regulation was the product of a rational decision-maker. It is of no consequence that the ETS regulation was adopted in a less than ideal fashion. Under the APA as it existed at the time the regulation was adopted the question was, instead, whether the regulation "could not conceivably have been the product of a rational decision-maker." RCW 34.05.570(2)(c) (1992). Both parties agree that the resolution of this question turns upon Neah Bay:
The court's task is to determine if a given regulation is reasonable without substituting this court's judgment for that of the agency. First, the court inquires if the agency's explanation of its own rule is clear. Second, the court must ask if the agency utilized the appropriate statutory framework, whether it used correct factors in deciding the rule, and if it avoided improper factors. Third, the court must decide if a decision-maker could have reached the conclusion reached by the agency (taking the foregoing into account) by some reasonable process.
Neah Bay, 119 Wash.2d at 473-74, 832 P.2d 1310 (emphasis added). As for the first part of this three-part test, the ETS rule itself is clear, although the explanation for it is hardly exhaustive in its detail. However, this Court will even "`uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" Neah Bay, 119 Wash.2d at 471, 832 P.2d 1310 (quoting approvingly from Motor Vehicle Mfrs. Ass'n of *713 U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) [hereinafter State Farm ]. "It begins with the agency's explanation ... and then decides if the agency's reasoning is plausible." Neah Bay, 119 Wash.2d at 471, 832 P.2d 1310. Under the second and third parts of the test we determine whether the Department could have promulgated this rule under the WISHA by "some reasonable process." Neah Bay, 119 Wash.2d at 474, 832 P.2d 1310. In determining this,
[t]his analysis requires the court to review the administrative record to determine the factors employed by the agency and the quality of its reasoning. The court must scrutinize the record to determine if the result was reached through a process of reason, not whether the result was itself reasonable in the judgment of the court.

Neah Bay, 119 Wash.2d at 474, 832 P.2d 1310 (emphasis added). To a large extent this discussion is redundant with the discussion above of whether the Department relied upon the "best available evidence" as required under the WISHA. See RCW 49.17.050(4).
This case is quite unlike Neah Bay, where "[n]o rule-making file is on the record; indeed, the record does not contain any reference to agency files or any other sort of administrative record." Neah Bay, 119 Wash.2d at 475, 832 P.2d 1310. Here the administrative record was extensive. The CES expressly states that the EPA report in that record, among other reports, was relied upon in determining that ETS poses lung cancer and cardiovascular disease risks  and the Department's officials characterized the risk of lung cancer posed by ETS as significant in their testimony, and offered a very "plausible" explanation for why that risk was statistically unquantifiable. Neah Bay, 119 Wash.2d at 471, 832 P.2d 1310.
The Companies note that the United States Supreme Court has written that "the courts may not accept appellate counsel's post hoc rationalizations for agency action." State Farm, 463 U.S. at 50, 103 S.Ct. 2856. Yet there is more than enough information in the CES and the trial record that even under State Farm the Department's action could be "upheld, if at all, on the basis articulated by the agency itself," State Farm, 463 U.S. at 50, 103 S.Ct. 2856, and any appellate rationalizations would be overkill anyway. This despite the fact that the Companies are correct in a debate with the Department, centering upon a page of a law review article cited in Neah Bay, over which of three models of rationality review described by Professor Funk that we came closest to. In Neah Bay the third model, based upon Pacific States Box & Basket Co. v. White, 296 U.S. 176, 185-86, 56 S.Ct. 159, 80 L.Ed. 138, 101 A.L.R. 853 (1935), was clearly referred to as "discredited." Neah Bay, 119 Wash.2d at 472, 832 P.2d 1310. The first model, which the Companies favor, mirrors the State Farm language in that in support of a regulation it "does not allow the explanatory justification to be supplied merely by an attorney's affidavits or briefs in court." Funk, 43 ADMIN. L.REV. at 157-58 (emphasis added). Instead, it "presumes an agency explanation or justification for the rule ... although the model does not necessarily require the explanation to be contemporaneous with the rule." Funk, 43 ADMIN. L.REV. at 157 (emphasis added) (footnote omitted). Thus, even though we follow that model, it is a Pyrrhic victory for the Companies. It further proves that their position is incorrect on the first issue above, inasmuch as the explanatory trial testimony of the Department's officials was not barred.
We cannot, however, agree with the Department and follow Funk's second model:
A second model accepts the idea of the record of an agency rulemaking but rejects the requirement for an agency explanation of the rule. Under this model, the record remains the mass of information considered by the agency in the course of the rulemaking ... but the agency is not obliged to explain how it reached its conclusion from that information.... [T]he court does not review the agency's explanation of how and why it adopted the rule from this information. Rather, the court reviews the information to determine whether a rational decision-maker could have reached the conclusion the agency did on the basis of the information before it. *714 Funk, 43 ADMIN. L.REV. at 158. Although this language mirrors some of that found in Neah Bay, its permissiveness is at odds with the undeniable requirement under the APA "for an agency explanation of the rule" namely, the CES. Furthermore, other considerations strongly militate against embracing this model, such as the risk that the court might substitute its judgment for that of the agencywhich is expressly barred by Neah Bay and the APA. This court "shall not itself undertake to exercise the discretion that the legislature has placed in the agency." RCW 34.05.574(1).
To a large extent, however, this debate is splitting hairs and irrelevant to the resolution of this case. As Professor Funk has noted, under either the first or second models "[t]he agency invariably will articulate in the litigation an explanation for the rule and how it is derived from the record, and the court will undoubtedly subject that explanation to scrutiny," making the approach to judicial review under the two models "similar, if not identical." Funk, 43 ADMIN. L.REV. at 159.
The Companies correctly observe that the Department elected to rely upon the EPA report and other studies without conducting its own study. This decision to not duplicate the efforts of other studies and to rely upon those already reported appears to have been "plausible," and "reached through a process of reason." Neah Bay, 119 Wash.2d at 471, 474, 832 P.2d 1310. Significantly, there is no evidence that the Department acted arbitrarily or capriciously in so deciding. The Companies were allowed to make their case, and 15 boxes of administrative record reveal that they did so vigorously. The Companies try to add to known rationality review requirements that the decision to promulgate the ETS regulation must be based upon both a "rational and expert analysis of the administrative record," Appellants' Br. at 2 (emphasis added), but they cite no real authority for this argument other than to make the assertion that the Department chose to "rely blindly on reports from other government entities in the face of specific and detailed contrary scientific evidence in the administrative record." Appellants' Br. at 60 (emphasis added). They cite American Fed'n of Labor & Congress of Indus. Orgs. v. Occupational Safety & Health Admin., 965 F.2d 962, 984 (11th Cir.1992) [hereinafter AFL-CIO], as forbidding such reliance. Again, this is an attempt to import a federal opinion into a state case, but even there the court stated that "we do not believe that OSHA is required to independently research all aspects of its rules.... OSHA is entitled to rely on ... consultants, as well as studies in the scientific literature"although, of course, it must make those findings specifically required of it by statute. AFL-CIO, 965 F.2d at 984. Moreover, the testimony of the Department's officials makes it clear that they did not rely "blindly" on studies such as the EPA report, but chose to do so only after applying their expertise[13] in weighing the available evidence.
Here the CES did contain "the agency's reasons for adopting the rule," RCW 34.05.355 (1992), and even though it was surely a "concise explanatory statement" it appears to have met statutory muster in its own rightwith the permissible trial testimony of the Department officials only reinforcing it. "`[T]he agency's path may reasonably be discerned.'" Neah Bay, 119 Wash.2d at 471, 832 P.2d 1310 (citation omitted). It is again important to emphasize that the ETS regulation is not a complete ban on smoking in private workplaces. The regulation only limits smoking indoors, and allows employers to provide smoking lounges. Furthermore, it does not restrict, in any way, smoking that occurs outdoors or in outdoor workplaces. With that understood, we conclude that it is clear that the ETS regulation could quite "conceivably have been the product of a rational decision-maker." RCW 34.05.570(2)(c) (1992). Admittedly, our task would be easier were we able to champion one side or the other in this case. However, it is not for us to pass upon "whether the result was itself reasonable," Neah Bay, 119 Wash.2d at 474, 832 P.2d 1310, although the *715 dissent would have us do so. Moreover, we are not free to make forays outside of the administrative record in order to cite authorities to support our decision.[14] Nor, in interpreting Washington law, may we simply selectively defer to those federal opinions that support our views.

CONCLUSION
We are aware that issues surrounding the smoking of cigarettes have consumed much of the public's interest in recent years. Efforts by the government to inhibit the public smoking of cigarettes have been, to say the least, controversial. Nevertheless, the Department of Labor and Industries has been vested with significant authority to protect the health and safety of Washington's workers on the job site. We cannot say that the Department has abused that authority or acted irrationally here in regulating smoking in the workplace in an effort to protect the health of workers, both smokers and nonsmokers. We conclude, therefore, that both the APA and the WISHA were complied with in the promulgation of the ETS regulation and affirm the Thurston County Superior Court.
GUY, C.J., DURHAM, SMITH, JOHNSON, MADSEN and TALMADGE, JJ., concur.
SANDERS, J. (dissenting).
These regulations prohibiting most workplace smoking were not promulgated in accordance with requirements of the Administrative Procedure Act (APA), RCW 34.05, or the Washington Industrial Safety and Health Act (WISHA), RCW 49.17. Neither the agency's concise explanatory statement nor the administrative record itself demonstrates the rational rule-making process envisioned by the APA. Moreover the record fails to demonstrate the agency properly considered feasibility or that it based its decision on the best available evidence, as required by WISHA. On these grounds I would reverse and remand.
Procedurally, the APA requires a regulatory agency to issue rational regulations developed through a reasoned process, utilizing correct scientific factors while eschewing incorrect ones. Neah Bay Chamber of Commerce v. Department of Fisheries, 119 Wash.2d 464, 473-74, 832 P.2d 1310 (1992). Substantially, WISHA requires the regulations be at once feasible and predicated upon the best available evidence. RCW 49.17.050(4). Together the APA and WISHA statutes mandate regulations based upon the best available scientific evidence, while prohibiting those prompted by personal bias or political persuasion.
Unfortunately the specter that these regulations were promulgated on less than the *716 required reasoned, scientific basis permeates this record. Even when Department of Labor and Industries (L & I) Director Mark Brown first announced the rules he proudly provided what the department termed "sound bites" such as "another blow to Joe Camel" and "How high does the body count have to go?", suggesting an emotionalized hyperbole more indicative of a political decision than reasoned, scientific inquiry.[1] AR 58: 34470.[2] The Joint Administrative Rules Review Committee of the Washington State Legislature apparently shared this concern, finding these regulations "not within the intent of the Legislature as expressed by the statute which the rules implement, and that the rules have not been adopted in accordance with all applicable provisions of law." Clerk's Papers at 123.
Regulations Not Issued in Compliance With APA
The APA requires regulations be "the product of a rational decision-maker." RCW 34.05.570(2)(c) (1992). Judicial review of regulations requires the court to examine their reasonableness but not substitute its judgment for that of the agency. Neah Bay, 119 Wash.2d at 473, 832 P.2d 1310. APA review measures the regulation against a three-part test: (1) is the agency's explanation of its own rule clear; (2) has the agency used the appropriate statutory framework, using correct factors and eschewing incorrect ones; and (3) could a decision-maker reach the conclusion reached by the agency, taking the foregoing into account, by some reasonable process? Id. at 474, 832 P.2d 1310. The standard for judicial review is not intended to be a smoke screen for affirmation, but requires "`thorough, probing, in-depth review.' " Id. at 470, 832 P.2d 1310 (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99, 105, 97 S.Ct. 980, 984, 51 L.Ed.2d 192 (1977)).
Our review necessarily begins with the agency's own explanation of its rule. Neah Bay, 119 Wash.2d at 474, 832 P.2d 1310. The agency explanation is presented in the form of a legislatively mandated concise explanatory statement (CES) prepared by the department.[3] "The purpose of such a statement is (1) to assure the agency actually considered all arguments made and (2) to facilitate court review." Anderson, Leech & Morse, Inc. v. Washington State Liquor Control Bd., 89 Wash.2d 688, 693, 575 P.2d 221 (1978). If the CES on its face does not substantially comply with the statute and thus allow the court to conduct its review, the regulation so promulgated is invalid for failure to comply with this statutory mandate.[4]
The complete agency CES in relevant part provides:
There is a substantial body of evidence indicating that environmental tobacco smoke has a causal connection to lung cancer in non-smoking adults. The Environmental Protection Agency has concluded that environmental tobacco smoke is a Class A carcinogen. By definition, a Class A carcinogen is one where there is sufficient evidence from epidemiologic studies to support a causal connection between exposure to the agents and cancer. The conclusions of the Environmental Protection *717 Agency are consistent with reports issued by the Surgeon General of the United States, the National Research Council, and other studies. Additionally, studies have documented a causal link between environmental tobacco smoke and cardiovascular disease.
The presence of environmental tobacco smoke in office workplaces is unnecessary to the work being performed in these workplaces. Therefore, the exposure of office workers to the hazards of lung cancer and cardiovascular disease is entirely unnecessary.
AR 58: 34449. We begin by testing this CES under the announced criteria of the APA.
Obviously the department places primary reliance on the Environmental Protection Agency (EPA) report's classification of second-hand smoke as a Class A carcinogen; however, it fails to recognize the important arguments which both challenge this conclusion and render it immaterial. The CES does not evidence the department's reasoning whereby it accepts the EPA report as reliable and valid, nor does it place the presence of an alleged carcinogenous element in the context of a predictable and substantial risk to persons in the workplace, as Class A carcinogens also include nickel, an element that can be found in mother's milk, and chromium, a substance found in all tap water.[5] We do not ban these substances absent a further showing of practical harm in the environment of actual use; however, the CES does not, on its face, provide that link.
Another central failing of the CES is its failure to evidence critical consideration of the scientific reliability and validity of the EPA report upon which the entire regulation purports to stand. Since there are serious arguments advanced in this record that the EPA report is unscientific and unreliable, it is incumbent that the CES at least identify these arguments so that the court may be assured on judicial review that the agency afforded these objections proper consideration. But it does not.[6]
The CES states the EPA report is consistent with other unspecified reports and studies; however, we are not told what the consistencies are, nor what the inconsistencies may be. Nor, most importantly, are we told why we should accept these reports as true while rejecting others. These were also questions raised by appellants and not addressed in the CES.
We are told that environmental tobacco smoke (ETS) is "unnecessary to the work being performed" (AR 58: 34449) and that "[t]herefore" the exposure of workers to hazards of ETS is "entirely unnecessary." Id. This does state the agency view on feasibility. It tells us the director considers employee smoking preferences illegitimate, from which he concludes any interest in smoking held by these workers is not worthy of regulatory consideration. Whether this reasoning meets the statutory standard for feasibility will be considered later.
Failure to recognize important arguments conflicts with the most basic statutory requirements of a proper CES in violation of RCW 34.05.355, repealed by Laws of 1995, ch. 403, § 305 (hereinafter RCW 34.05.355 (1992)). Moreover, the rule as explained by the CES is most problematic under the third prong of the three-part analytical test set out in Neah Bay because it does not provide a clear explanation of the thought process behind the rule, thus denying assurance on judicial review that the rule resulted from a reasoned process. See Neah Bay, 119 Wash.2d at 474, 832 P.2d 1310.
The majority's overlooking these shortcomings of the CES might be justified if the administrative record did provide the means *718 to review the department's actions. Yet, as Director Mark Brown testified, no document in the 45,000 pages of the administrative record articulates any explanation for the department's decision to regulate ETS in the manner in which it did. Report of Proceedings (RP) at 146-47.
As explained in Neah Bay, our review of the administrative record must enable us to determine the factors employed by the agency and the quality of its reasoning to test its statutory compliance; we do not simply seek evidence to sustain the agency's conclusion. Neah Bay, 119 Wash.2d at 474, 832 P.2d 1310. However this administrative record fails to provide any assistance as to the agency's reasoning process. See also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 50, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (agency actions must be upheld on the basis articulated by the agency itself, not post hoc rationalizations of its counsel).[7]
The majority seeks to distinguish Neah Bay by stating that in that case there was no administrative record to supplement. Majority at 704-705. True, but that is not the point. The purpose of the administrative record is to provide a reviewing court with evidence that the agency had in fact engaged in the necessary rational process required by the statute. Neah Bay, 119 Wash.2d at 471, 832 P.2d 1310 ("agency must examine the relevant data and articulate a satisfactory explanation for its action including a `rational connection between the facts found and the choice made'") (quoting with approval State Farm, 463 U.S. at 43, 103 S.Ct. 2856). Whether the record is nonexistent or is simply a catchall collection of 15 boxes is irrelevant. Post hoc rationales and testimony cannot supplement (nor lawfully supplant) that which is not there to begin with. If there is nothing in the administrative record that the department can identify which shows even a modicum of support for its claim that these regulations were the product of reason on the part of the regulators, then the regulation must fail without regard to post hoc rationalizations. Neah Bay, 119 Wash.2d at 473-74, 832 P.2d 1310.[8]
It is equally the court's role to "examine the actions of the agency to ensure that they were only undertaken after proper consideration of appropriate facts." Neah Bay, 119 Wash.2d at 475, 832 P.2d 1310. This we must do.
Central to the regulation, and our review, is the EPA report. The department issued these regulations primarily purporting to base them on this report, however, admitted it did no independent research or statistical analysis, nor even a critical review of the reliability and accuracy of this critical source document. RP at 116-118; 388-390. In fact, the agency employee charged with responsibility to review the EPA report testified he did not even have the necessary skills to even evaluate the EPA analysis. RP at 482-83; 573. Reliance based on blind faith or prejudicial predisposition is inconsistent with the department's statutory obligation to *719 engage in a rational decision-making process because it is not rational. See AFL-CIO v. OSHA, 965 F.2d 962, 984-85 (11th Cir.1992) (agency may use outside consultants in formulating regulation, but may not merely adopt outside recommendations, and, instead, should set forth its own analysis and findings justifying regulations).
The majority excuses this abdication by noting the department made a rational decision to not "reinvent the wheel." Majority at 708. However, there is a difference between "reinventing the wheel" and inspecting the wheel to make sure it is round, not square. And there is a difference between relying on a comprehensive and critical examination of all the data, and adopting the recommendations of a selected report simply because it affirms the predetermined result the reviewer seeks. Moreover, nothing in this record demonstrates the reasoning process behind the department's decision to conclude this report is "the best available evidence" as required by WISHA. RCW 49.17.050(4).
Recent judicial review of the EPA report found much to criticize:
In this case, EPA publicly committed to a conclusion before research had begun; excluded industry by violating the Act's procedural requirements; adjusted established procedure and scientific norms to validate the Agency's public conclusion, and aggressively utilized the Act's authority to disseminate findings to establish a de facto regulatory scheme intended to restrict Plaintiffs' products and to influence public opinion. In conducting the ETS Risk Assessment, EPA disregarded information and made findings on selective information; did not disseminate significant epidemiologic information; deviated from its Risk Assessment Guidelines; failed to disclose important findings and reasoning; and left significant questions without answers. EPA's conduct left substantial holes in the administrative record. While so doing, EPA produced limited evidence, then claimed the weight of the Agency's research evidence demonstrated ETS causes cancer.
Flue-Cured Tobacco Coop. Stabilization Corp. v. United States Envtl. Protection Agency, 4 F.Supp.2d 435, 465-66 (M.D.N.C. 1998) (footnote omitted).[9]
Even the actual record before the agency undermines confidence in this reliability of the report. See, e.g., Maurice LeVois, Ph.D., The EPA Report on Environmental Tobacco Smoke Does Not Provide a Scientific Basis for Regulating Smoking in the Workplace (Dec. 14, 1993) (AR 48: 25143-25154) (EPA report concentrated on spousal studies which supported its view while ignoring workplace studies that were contrary); Maxwell W. Layard, Ph.D., Comments on the EPA Review Draft "Respiratory Effects of Passive Smoking: Lung Cancer and Other Disorders" (June 30, 1992) (AR 41: 22623-22647) (statistical analysis in EPA report unsupportable studies show only a statistically nonsignificant result). As one law review analysis notes, the EPA simply ignored the data on workplace studies, which overwhelmingly showed no statistically significant overall lung cancer risk to nonsmokers from ETS. John C. Fox, An Assessment of the Current Legal Climate Concerning Smoking in the Workplace, 13 St. Louis U. Pub.L.Rev. 591, 629 (1993). Nor is there any evidence in this record demonstrating the director recognized or even questioned whether the EPA manipulated the data in violation of its own guidelines "to artificially double the likelihood of ruling out chance as a possible explanation" of increased risk of lung cancer. Id. at 630. Faith is not reason.[10] I fear the majority has too much of the former.
*720 Perhaps another even more telling example of how the department's lack of reason, if not predisposition, potentially infected the final regulations can be seen in the impact on the department by the Surgeon General's 1986 report. See U.S. Dep't of Health and Human Servs., The Health Consequences of Involuntary Smoking: a report of the Surgeon General (1986). This report is one of the documents mentioned in the CES. It is also one of the reports that L & I Director Brown purported to have relied upon. RP at 112; see also Majority at 709 (citing report). Yet the copy of the report in the record submitted by the department is edited to omit the sections most relevant to the question pertinent to the regulation. Missing is much of the section of the report on "Policies Restricting Smoking in Public Places and the Workplace," including nearly the entire section entitled, "Review of Current Evidence on Impact," as well as all of the section on "Recommendations for Future Research," and the report's "Conclusions." AR 52: 32434-32483. Why these omissions? What reason justifies these omissions? Where is the evidence demonstrative of a rational review of the data, or even an actual review of the relevant data? How could the director reasonably rely upon this report to justify the regulation when the critically relevant material is edited out? The majority doesn't tell us.
The record also contains numerous studies which contradict the conclusion that ETS is a hazard in the workplace. See, e.g., Geoffrey C. Kabat & Ernst L. Wynder, Lung Cancer in Nonsmokers, 53 Cancer 1214, 1219 (1984) (AR 41: 22669-22674) (plausibility of role of passive inhalation in lung cancer can be questioned on several grounds); P.N. Lee et al., Relationship of passive smoking to risk of lung cancer and other smoking-associated diseases, 54 Br. J. Cancer 97, 101 (1986) (AR 41: 22718, 22722) (recent review of data has concluded that overall there is no reliable scientific evidence of a causal relationship between passive smoking and lung cancer); Anna H. Wu et al., Smoking and Other Risk Factors for Lung Cancer in Women, 74 J. Nat'l Cancer Inst. 747, 748 (Apr.1985) (AR 41: 22742, 22743); Lawrence Garfinkel, Time Trends in Lung Cancer Mortality Among Nonsmokers and a Note on Passive Smoking, 66 J. Nat'l Cancer Inst. 1061, 1065 (1981) (AR 41: 22802, 22806). But why did the department refuse to credit studies which contradict the EPA report's conclusions? See RP at 571-75. Did the department seek an answer, or a result? The CES is simply silent on why the EPA report is credited while its critics are ignored. The court must look for reasons, but none can be found in this administrative record.
Even the materials cited by the majority are not clearly indicative of a correlation between passive smoke and cancer. For example, Ross C. Brownson et al., cited by Majority at 710, wrote that "[i]n general, there was no elevated lung cancer risk associated with passive smoke exposure in the workplace." Ross C. Brownson et al., Passive Smoking and Lung Cancer in Nonsmoking Women, 82 Am. J. Pub. Health 1525, 1527 (1992) (AR 57: 34255, 34257). The report by the Washington Department of Health and Fred Hutchinson Cancer Research Center Cancer Prevention Research Program (1990 Hutchinson Cancer Research Ctr. Report), cited by Majority at 709, *721 calculates a total death rate from passive smoking of 89.5 deaths a year (including spousal, family, and restaurant exposures), yet, admits it bases this number upon a "crude" analysis which in turn is predicated on assumptions and estimates. See Washington Dep't of Health and Fred Hutchinson Cancer Research Ctr., Smoking in Washington State: Status of the Problem and Recommendations for Intervention from the Tobacco-Related Cancers Technical Committee 72 (Apr.1990) (AR 53: 32524). The Glanz and Parmley report, cited by Majority at 710 n. 10, is also a study of the relationship between smoking at home and the risk of heart disease. Stanton A. Glantz & William W. Parmley, Passive Smoking and Heart Disease: Epidemiology, Physiology, and Biochemistry, 83 Circulation 1, 1 (Jan.1991) (AR 10: 13001). The NIOSH report, cited by the Majority at 710, and by Director Brown in his testimony, RP at 112, is entitled, Environmental Tobacco Smoke in the Workplace. U.S. Dep't of Health and Human Servs., National Inst. for Occupational Safety and Health, Environmental Tobacco Smoke in the Workplace: Lung Cancer and Other Health Effects (June 1991) (AR 49: 30057). This is an interesting title since the overwhelming data come from studies of household smoking. AR 49: 30075.[11]
Notwithstanding, the majority broadly asserts, "It is difficult to even characterize such evidence [regarding the dangers of workplace ETS] as `conflicting,' let alone question the Department for resolving any conflict in the manner it did." Majority at 710. Not only is this statement simply incredible in the face of the overwhelming evidence presented in this record, it abdicates our obligation of review as "a disagreement among experts is irrelevant to the standards set forth in the APA...." Neah Bay, 119 Wash.2d at 475, 832 P.2d 1310. Rather, we "must make certain that judgment was in fact exercised properly and fairly." Id. (emphasis added). The majority substitutes blind deference for substantive review. In so doing it abdicates the judicial responsibility to protect our fellow citizens from irrational bureaucratic excess. I would hold L & I to the requirements of the statute which gave it existence and confer upon it rule-making authority.[12]
Even accepting the department's post hoc rationalizations, it is clear that the regulations enunciated were not the result of a rational decision-making process, and thus not in compliance with the APA.[13]
Regulations Violate WISHA
WISHA requires a health and safety standard be set "which most adequately assures, to the extent feasible, on the basis of the best available evidence, that no employee will suffer material impairment of health or functional capacity even if such employee has regular exposure to the hazard...." RCW 49.17.050(4). We begin by recognizing if the department's reliance on the flawed EPA report is a product of prejudice, questionable analysis, and/or relies upon data manipulated in violation of the EPA's own guidelines, the regulation is hardly predicated "on the best available evidence." Id.
*722 This court should be guided by the United State Supreme Court's interpretation of identical language in the federal Occupational and Safety Health Act (OSH Act).[14] That Court construed language which required the regulatory agency to set a health standard that "`most adequately assures, to the extent feasible, on the basis of the best available evidence'" that no material harm would result, to mean the agency should consider differences in degrees of significance rather than simply a total elimination of all risks. Industrial Union Dep't, AFL-CIO v. American Petroleum Inst., 448 U.S. 607, 643 n. 48, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980) (plurality opinion) (hereinafter Benzene) (quoting § 6(b)(5) of the federal OSH Act).[15] But what risk does workplace smoke visit on the worker? In what concentration or for what duration does the risk become significant? Are the chances of contracting cancer from ETS less than being struck by lightning on a sunny day, or is the slightest whiff enough to send us choking to the emergency room? Inquiring minds want to know. Proper judicial review requires assurance that the agency has investigated the questions and concluded that the burden imposed by the regulation is justified by the risk which it eliminates.[16]
In Benzene the Court held that prior to the issuance of any safety standard, a determination must be made that the standard is reasonably necessary and appropriate to remedy a significant risk of material health impairment. Benzene, 448 U.S. at 639, 100 S.Ct. 2844. As the Court explained, the idea behind the regulations was not to create a risk-free workplace, but a safe one, and that "a workplace can hardly be considered `unsafe' unless it threatens the workers with a significant risk of harm." Id. at 642, 100 S.Ct. 2844. Thus, the Court concluded, "at a bare minimum" new standards could not be issued absent a finding of "a significant risk of harm and therefore a probability of significant benefits...." Id. at 644, 100 S.Ct. 2844. To hold otherwise, said the Court, would give an agency the power "to impose enormous costs that might produce little, if any, discernible benefit." Id. at 645, 100 S.Ct. 2844.
Incredibly, the majority concludes that L & I did comply with Benzene, Majority at 707-708. But Benzene says that while it does not impose a "mathematical straitjacket," the agency "does have an obligation to find that a significant risk is present before it can characterize a place of employment as `unsafe.'" Benzene, 448 U.S. at 655, 100 S.Ct. 2844 (emphasis added). But here there *723 is no such finding. As L & I Manager John Peard (who prepared the regulations) testified, the idea that ETS poses a significant risk is not in written form anywhere in the administrative record nor in any of the written materials he passed to then L & I Director Mark Brown. RP at 385; see also RP at 244 (testimony of L & I WISHA Coordinator Stephen Cant). L & I also made no effort to seek out or quantify any risk to Washington workers from ETS. RP at 399-400; 580-81. It simply relied upon questionable data that supported a conclusion which it accepted without question. RP at 323; 482-83; 573-74. It was exactly this lapse in effort that the Supreme Court found unforgivable in Benzene. Benzene, 448 U.S. at 646, 100 S.Ct. 2844; see also id. at 637, 100 S.Ct. 2844 (noting that OSHA had impermissibly relied upon its assumption that "some benefits" would result from a reduction in exposure to Benzene).
The majority also notes the difference between the necessary "by product" at issue in Benzene and the "unnecessary" ETS. Majority at 706-707. The department seems to forgo any analysis of actual risk based on the CES claim that smoking is "unnecessary." However, that is not the test. See, e.g., American Textile Mfrs. Inst., 452 U.S. at 513 n. 32, 101 S.Ct. 2478 (all standards must be addressed to "significant risks" of material health impairment); AFL-CIO, 965 F.2d at 975 (agency "has a responsibility to quantify or explain, at least to some reasonable degree, the risk posed by each toxic substance regulated" (emphasis omitted)).
The majority is also oblivious to the economic and social costs of this regulation.[17] In fact the costs are potentially enormous. According to the state, a typical smoking lounge to accommodate 10 smokers "could be built for as little as $1,500." Resp't's Br. at 66 (emphasis added). Recognizing there are more than 130,000 private firms in Washington (U.S. Department of Commerce, Statistical Abstract of the United States 1998, at 550 (Oct.1998))and counting only private employers and further assuming that each firm has only one indoor work environment, whatever the firm's sizethe cost of implementing this regulation statewide must exceed $195,000,000. Although the true economic impact of these regulations was the subject of much testimony before the department, see, e.g., AR 64: 42421-23; 42660; 42714; 42766; the department simply dismissed all cost analysis cavalierly issuing a statement instructing "[e]mployers who wish to accommodate their smoking employees will have to calculate costs factors [themselves].... The cost could be nothing for employers with `smoke free' policies for their buildings." AR 58: 34457 (emphasis added).
More fundamental, however, is the loss of freedom to our workers and their employers to freely bargain working conditions to meet their preferences.
How would our majority review a regulation which forbids men to wear ties or women scarves so as to entirely eliminate the remote prospect that a tie might be caught in a copy machine? In a sense one could say the dollar cost is nil; however, the cost measured by the loss in personal freedom to dress as one pleases would be great. Is not that also a cost worthy of consideration?
We do things not only because we must but because we will. We purchase things not only because they are absolutely "necessary" but also because they give us pleasure. Such is the blessing of a free society. But when the director or the majority says "there is no cost," what they mean is "there is no cost to them."[18] The cost is borne by those whose *724 individual choices are precluded by the coercive power of the state. In Washington more than 800,000 smoke. AR 58: 34462. Under preexisting law it is not within the agency's purview to impose that cost absent a reasoned analysis based upon scientific fact.
If the requirements of complying with this rule are in excess of proven benefits the rule violates WISHA. But how can we review that prospect when the relevant analysis was not made by the director? As the Supreme Court has explained, an agency is not empowered to establish regulations that "provide absolutely risk-free workplaces whenever it is technologically feasible to do so .... [the Federal OSH Act] was intended to require the elimination, as far as feasible, of significant risks of harm." Benzene, 448 U.S. at 641, 100 S.Ct. 2844. There the Court invalidated a ban on dermal contact with Benzene, which was implemented on the basis of a no-risk policy. Id. at 662, 100 S.Ct. 2844. Moreover, where is the evidence that the department even considered, much less appropriately rejected, less onerous regulations. Such is also an aspect of feasibility. See American Textile Mfrs., 452 U.S. at 513 n. 32, 101 S.Ct. 2478. What about limiting ETS exposure instead of a total ban? What about segregating smokers and nonsmokers? Would a less onerous regulation achieve an acceptable level of risk? What is the risk? And what is acceptable? Neither the director nor the majority tells us. I posit absent evidence of thoughtful consideration these regulations do not meet the statutory standard.
Conclusion
The department's regulations raise the specter that rather than being the product of a rational process, they may well reflect what one scholar has described as "the contemporary anti-tobacco frenzy." Rivka Widerman, Tobacco is a Dirty Weed. Have We Ever Liked It? A Look at Nineteenth Century Anti-Cigarette Legislation, 38 Loy. L.Rev. 387, 389 (1992).[19] The department chose to *725 issue only the regulations regarding ETS, and to ignore the many other possible sources of health problems resulting from lowered indoor air quality. AR 58: 34453. Yet reported statistics suggest ETS is the source of indoor air problems only in a minute number of cases. Gray Robertson, "Indoor Pollution: Sources, Effects and Mitigation Strategies" in Environmental Tobacco Smoke, Proceedings of the International Symposium at McGill University 1989, at 333 (Donald J. Ecobichon & Joseph M. Wu eds., 1990).
The department chose to ignore the conclusion of two-thirds of the legislative members of the Joint Administrative Rules Review Committee that the regulations violated the legislature's intent and were not adopted in accordance with all applicable provisions of law.
The department chose to rely entirely upon a highly flawed study, to ignore all contrary evidence, and to refrain from conducting its own analysis of the data it used.
The department chose not to enter findings that ETS actually poses a substantial risk to the health of the workers of the State of Washington, much less quantify such in even the most rudimentary way.
The department chose not to consider the feasibility or economic impact of its regulations.
These are the choices that the majority affirms. Such blanket authority to impose regulations upon even a known carcinogen, which ETS is not, grants to the department pervasive power to impose enormous costs that might produce little, if any, discernible benefit. Such is not the purpose of either the APA or WISHA, but rather the evil against which those statutes guard when properly enforced. See Benzene, 448 U.S. at 645, 100 S.Ct. 2844.
As the Supreme Court has warned, "`[e]xpert discretion is the lifeblood of the administrative process, but "unless we make the requirements for administrative action strict and demanding, expertise, the strength of modern government, can become a monster which rules with no practical limits on its discretion."'" State Farm, 463 U.S. at 48, 103 S.Ct. 2856 (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 167, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962) (quoting New York v. United States, 342 U.S. 882, 884, 72 S.Ct. 152, 153, 96 L.Ed. 662 (1952) (Douglas, J., dissenting))). I would recognize these regulations are invalid because they do not comply, either procedurally or substantially, with state law, and remand to the department with instructions to consider any future ETS regulations in accordance with the requisites of the APA and WISHA.
DOLLIVER, J.P.T., concurs.
NOTES
[1] Known also as "involuntary smoking," "passive smoking," or colloquially as "second-hand smoking."
[2] These proposals addressed issues such as requiring planning prior to the remodeling of occupied offices to minimize degradation of indoor air quality, requiring documentation of maintenance and operation of heating, ventilation and air conditioning systems, and requiring the documentation of health symptoms and illnesses related to indoor air quality.
[3] The Department's rule-making file shall be referred to by the abbreviation AR, for "Administrative Record." In any citation to the AR, the number preceding the colon is the volume number, the number following it is the page number.
[4] The Companies do not renew here their earlier claims at summary judgment that the Department lacked the statutory authority to regulate smoking in private workplaces, that the Department violated the Regulatory Fairness Act, RCW 19.85, by failing to ameliorate the regulation's impact upon small businesses, and that the Department failed in its duty under the APA, RCW 34.05.355(1)(b), repealed by Laws of 1995, ch. 403, § 305, to describe differences between the initial proposal and the regulation as adopted.
[5] "The rulemaking file submitted to this court is the largest rulemaking file ever assembled by the Department." Resp'ts' Br. at 4.
[6] The Companies may even be misreading federal law. "The court may require the administrative officials who participated in the decision to give testimony explaining their action.... [H]ere there are no ... formal findings and it may be that the only way there can be effective judicial review is by examining the decisionmakers themselves." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (citations omitted), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977)). The Companies attempt to limit Overton Park to its facts, but, perhaps tellingly, they cite no Supreme Court opinion which does so.
[7] The Companies attempt to augment the test by stating that it also requires "the least restrictive means for reducing any risk." Appellants' Br. at 17 (emphasis added). This suggests the necessity of a cost-benefits analysis. Actually, the Court wrote in Benzene that "[b]ecause the Secretary did not make the required threshold finding ... we have no occasion to determine whether costs must be weighed against benefits in an appropriate case." Benzene, 448 U.S. at 640, 100 S.Ct. 2844. It would later hold that a "cost-benefit analysis by OSHA is not required." Am. Textile Mfr. Inst., 452 U.S. at 509, 101 S.Ct. 2478.
[8] It is ironic to note here that benzene is just one of "more than 40 known or suspected human carcinogens" in tobacco smoke. AR 49: 30, 280.
[9] Instead the Companies offer cases such as Texas Indep. Ginners Ass'n v. Marshall, 630 F.2d 398 (5th Cir.1980), where the Fifth Circuit vacated regulations that the OSHA had adopted governing cotton dust exposure at cotton gins. However, in Marshall the only cotton ginning studies that the OSHA had relied upon had been conducted at "primitive foreign gins" in Africa, Marshall, 630 F.2d at 408, and it had otherwise relied upon studies conducted at other types of cotton industries with conditions vastly different in nature than those of the domestic ginning industry. Marshall, 630 F.2d at 409. We do not have that apples and oranges dichotomy here. ETS is ETS. A better federal case for comparison's sake would be Forging Indus. Ass'n v. Secretary of Labor, 773 F.2d 1436 (4th Cir.1985), wherein the court upheld an OSHA occupational noise regulation, noting, without even a hint of disapproval, that OSHA had based its finding of a significant risk posed to hearing by noise upon data from studies that had all been conducted by other agencies and individuals outside of OSHA. See Forging Indus. Ass'n, 773 F.2d at 1445.
[10] Other reports submitted by Philip Morris were even more damaging to the Companies' position. One, a study that was also in the Department's portion of the rule-making file, estimated that "[o]f 53,000 annual deaths in the United States attributed to passive smoking, 37,000 are attributed to heart disease compared with 3,700 for lung cancer." AR 10: 13, 004 (footnote omitted); AR 57: 34,264 (footnote omitted); Stanton A. Glantz & William W. Parmley, Passive Smoking and Heart Disease: Epidemiology, Physiology, and Biochemistry, 83 CIRCULATION 1, 4 (1991) (footnote omitted). Another study estimated "35,000 to 40,000 annual excess heart disease deaths among never-smokers and long-term former smokers due to passive smoking" in addition to an estimated 3,000 lung cancer deaths. AR 10: 13,018; Kyle Steenland, Passive Smoking and the Risk of Heart Disease, 267 J. AM. MED. ASS'N 94, 99 (1992). By comparison, the EPA report, which "only" estimates 3,000 ETS-related annual cancer deaths, looks extremely conservative. Perhaps proving the old adage "less is more" the Companies may have overlooked the true import of these studies amidst the avalanche of documents they filed. In any event, they provided ample "smoking guns" in favor of the ETS regulation.
[11] "In its ordinary meaning an activity is `feasible' if it is capable of achievement, not if its benefits outweigh its costs." Benzene, 448 U.S. at 719, 100 S.Ct. 2844 (Marshall, J., dissenting) (citing WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 831 (1976)).
[12] In such a case, compliance with the regulation would be achieved at no cost to employers, although the Companies, quite unconvincingly, assert that "decreased employee moral [sic]" is a "substantial" cost to industry resulting from the regulation. Appellants' Br. at 51. One struggles to imagine how a working population composed of a vast majority of nonsmokers would somehow be demoralized by the absence from their workplaces of a substance that can kill them. Moreover, employer costs may actually be averted by the ETS regulation. McCarthy v. Department of Soc. & Health Servs., 110 Wash.2d 812, 814, 759 P.2d 351 (1988), involved a worker who, "[a]s a result of her constant exposure to tobacco smoke in the workplace," developed chronic obstructive pulmonary disease that became "totally disabling" and forced her to quit her job. We held that employers can be directly sued for illness arising out of workplace exposure to tobacco smoke when such illness is not an occupational disease that falls within the basic coverage of the Washington Industrial Insurance Act, RCW Title 51. See McCarthy, 110 Wash.2d at 825, 759 P.2d 351.
[13] Two board certified industrial hygienists analyzed the studies that the Department relied upon and advised then-Director Brown.
[14] The dissent cites two law review articles, including one that was entirely outside the record of this case, to support the assertion that "[a]ntismoking regulations have a disproportionate effect upon the poor and African-Americans." Dissenting op. at 723 n. 18 (citing Rivka Widerman, Tobacco is a Dirty Weed. Have We Ever Liked It? A Look at Nineteenth Century Anti-Cigarette Legislation, 38 Loy. L.Rev. 387, 421-22 (1992); John C. Fox, An Assessment of the Current Legal Climate Concerning Smoking in the Workplace, 13 St. Louis U. Pub.L.Rev. 591, 625 n. 186 (1993)). Neither of these law review articles cite to any authority to support this statistical claim, and one strains to imagine the worst case scenario of being forced, in the absence of a smoking lounge, to smoke outside as an unendurable hardship. Could not the converse be arguably true, and in the absence of an ETS regulation the poor  being the least mobile in the job market  would be unable to quit jobs where they would be subjected to cancer-causing tobacco smoke? Fox, heavily relied upon by the dissent, has "testified at the request of The Tobacco Institute at state legislative hearings on workplace smoking legislation." Fox, supra, at 591 n. *. Would the dissent suggest that the Department rely upon works of advocacy instead of science? The dissent would require the Department to presciently comply with statutory language not yet adopted at the time of the ETS regulation's promulgation, by compelling it to use the CES to rebut all of the concerns raised by the Companies  without being first asked by the Companies to do so. See Dissenting op. at 716 n. 4. In short, the dissent "has taken nonlaw and treated it as the controlling interpretive key to the law as enacted." Pacific Northwest Bell Tel. Co. v. Department of Revenue, 78 Wash.2d 961, 969, 481 P.2d 556 (1971) (Hale, J., dissenting). This approach raises interesting questions: "How will future legislatures and their codifiers preserve for us the nonlaw, the imaginary sections of statutes which could have been but were never enacted? How lay to rest the ghosts of laws never passed?" Pacific Northwest Bell, 78 Wash.2d at 969, 481 P.2d 556 (Hale, J., dissenting).
[1] Perhaps appropriately, the L & I newsletter announcement of the regulations also cited a letter "urging Brown to run for governor." AR 58: 34471.
[2] AR refers to the administrative record (L & I's rule-making file) in this case. See Majority at 703 n. 3.
[3] "At the time it files an adopted rule ... an agency shall place into the rule-making file ... a concise explanatory statement about the rule, identifying (a) the agency's reasons for adopting the rule ...." RCW 34.05.355(1)(a), repealed by Laws of 1995, ch. 403, § 305 (hereinafter RCW 34.05.355 (1992)) (emphasis added).
[4] The majority notes that the APA at that time did require the department to issue a concise statement of the principal reasons for overruling the considerations urged against its adoption at the request of any interested person, a request not made by appellants. Majority at 705 (citing RCW 34.05.355(2) (1992)). This, however, does not relieve the agency of its independent burden to comply with the statute to meet its purpose. The failure of an "interested person" to object does not waive the duty of the agency to follow the law.
[5] John C. Fox, An Assessment of the Current Legal Climate Concerning Smoking in the Workplace, 13 St. Louis U. Pub.L.Rev. 591, 628 (1993). (Author's note: Manuscript of this article may be found at AR 48: 25155-25226.)
[6] As the United States District Court has opined, "[t]he court is faced with the ugly possibility that EPA adopted a methodology for each chapter, without explanation, based on the outcome sought in that chapter." Flue-Cured Tobacco Coop. Stabilization Corp. v. United States Envtl. Protection Agency, 4 F.Supp.2d 435, 456 (M.D.N.C.1998).
[7] I note that the majority questions the relevance of federal administrative law cases, stating that "[a]ppellants strain to import a federal standard of review into this state APA case." Majority at 704. But it is our legislature that has mandated this course of action. As we have held, the legislature "specifically provided that the APA be interpreted in a manner consistent with other states, model acts, and federal decisions." Neah Bay, 119 Wash.2d at 470, 832 P.2d 1310 (citing RCW 34.05.001) (emphasis added). The majority seeks to justify its decision to ignore federal precedents our legislature has mandated us to follow by quoting a law review article that bemoans the absence of specific language from the state APA. Majority at 704 (quoting William R. Andersen, The 1988 Washington Administrative Procedure ActAn Introduction, 64 Wash. L.Rev. 781, 803-04 (1989)). However the very language whose noninclusions so trouble Professor Andersen is also not present in the federal APA. See id. at 803 n. 125. Therefore, there is no reason why the absence of that language should impact the following of the Legislature's command to respect federal precedent.
[8] The majority writes, "a distinguishing fact in Neah Bay cannot be stressed enough: there the Department of Fisheries had failed to present any administrative record as required by the APA." Majority at 704. However, our holding in Neah Bay was not dependent upon that fact, as we did not address the full impact of a missing administrative record but merely concluded that a "lack of a rule-making file may itself constitute a sufficient reason to invalidate a regulation." Neah Bay, 119 Wash.2d at 476, 832 P.2d 1310 (emphasis added).
[9] The majority notes that this decision is on appeal, but then adds that even if the decision is correct, "the Department rule-making built atop it four years earlier would not ... collapse like a house of cards. Regulations are not that tenuous." Majority at 708. Why not? It was the department's statutory duty to rely upon the "best available evidence" and to engage in a rational decision-making process. The EPA report was no more reliable then than it is now. The only difference is the director did not conduct any inquiry to determine its reliability, but simply accepted it without articulated basis; whereas now others have performed the critical review which the Director was legally required to perform in the first place before imposing this regulation upon hundreds of thousands of our fellow workers and employers at great cost.
[10] The EPA report included no workplace studies, and instead relied upon reports of nonsmoking spouses of smokers. The majority dismisses this distinction by quoting the trial court's conclusion that workplace risks would at least be equal to, if not greater than, the spousal studies. Majority at 710 (citing RP at 822-23). However, the conclusions of a judge acting to review an administrative record are no better than the record before him. This is a question for science, not law. See, e.g., Maurice LeVois, Ph.D., The EPA Report on Environmental Tobacco Smoke Does Not Provide a Scientific Basis for Regulating Smoking in the Workplace (Dec. 14, 1993) (AR 48: 25145-25147) (outlining fundamental flaws in using spousal data to estimate lung cancer risks); John C. Fox, supra note 5, at 629 (OSHA has made clear that spousal data are of limited applicability in assessing actual risk in occupational exposure conditions). Also, there is much dispute as to even whether the data on family smoking are accurate. See, e.g., P.N. Lee, Environmental Tobacco Smoke and Mortality (1992) (AR 41: 22678); Linda C. Koo et al., Measurements of Passive Smoking and Estimates of Lung Cancer Risk Among Non-Smoking Chinese Females, 39 Int'l J. Cancer 162, 162 (1987) (AR 41: 22706); Anna H. Wu, Ph.D., et al., Smoking and Other Risk Factors for Lung Cancer in Women, 74 J. Nat'l Cancer Inst. 747, 748 (Apr.1985) (AR 41: 22742, 22743).
[11] The National Institute for Occupational Safety and Health's (NIOSH's) own bent can be seen in its analysis of one of the studies it relied upon. After noting the many flaws of the study's methodology and miniscule size, including a question as to whether the "nonsmokers" involved had ever smoked, NIOSH concludes, nonetheless, the report "did suggest an increased risk for adenocarcinoma among nonsmokers exposed to ETS." U.S. Dep't of Health and Human Servs., Nat'l Inst. for Occupational Safety and Health, Environmental Tobacco Smoke in the Workplace: Lung Cancer and Other Health Effects 1, 5 (June 1991) (AR 49: 30070).
[12] Contrary to the majority's assertion at 715 n. 14, there is no effort here to retroactively apply a change in the APA to this regulation. Nor does application of the rule of law as stated by this court in its 1992 decision in Neah Bay to an agency regulation issued in 1994 imply retroactivity.
[13] The United States Department of Labor, unlike L & I, has engaged in the proper regulatory process, and has, so far, declined to issue workplace regulations based upon the EPA report or the findings of other governmental agencies. App. 2 to Appellants' Reply Br., Action on Smoking and Health v. OSHA, 28 F.3d 162 (D.C.Cir. 1994) (Br. for the Secretary of Labor at 32 n. 24) (OSHA may not simply rely on EPA report but must make its own significant risk and feasibility determinations).
[14] While the Supreme Court's interpretation of such language is not binding it is nonetheless worthy of respect, especially where, as here, adequate state precedent is absent. See Xieng v. Peoples Nat'l Bank, 120 Wash.2d 512, 531, 844 P.2d 389 (1993).

As the majority notes, department regulations may exceed OSHA regulations. Majority at 706 (citing RCW 49.17.050(2)). However, this is irrelevant for two reasons: (1) OSHA has yet to issue ETS regulations because of its decision not to rely on outside agency data, such as the EPA report, see supra note 13; (2) the issue is not whether L & I may exceed OSHA regulations, but the meaning of identical statutory language.
[15] The majority notes that the rationale behind the Benzene holding was endorsed by only four Justices. Majority at 706. The majority also reads the Supreme Court's later reference to Benzene to merely indicate that OSHA itself has adopted the test. Id. (citing American Textile Mfrs. Inst. v. Donovan, 452 U.S. 490, 505 n. 25, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981)). However American Textile Mfrs. holds otherwise. There the Court makes clear it is analyzing whether OSHA has complied "with this Court's decision in [Benzene]." American Textile Mfrs., 452 U.S. at 505 n. 25, 101 S.Ct. 2478. Other federal authority also supports the conclusion that the "plurality" view is the binding one. See, e.g., AFL-CIO v. OSHA, 965 F.2d 962, 972 n. 13 (11th Cir.1992) ("courts of appeals have generally considered that the plurality opinion in Benzene was implicitly adopted by a majority of the Court in American Textile Mfrs. Inst. v. Donovan."). (Citations omitted.) While we are not bound by Benzene, I see no reason why we should not give similar language a similar construction. The Benzene lead opinion is certainly more persuasive, both because of its authoritative nature and its excellent reasoning, than the Benzene dissent which our majority prefers. See Majority at 710-711.
[16] Dr. Morton Lippman, chairman of the Science Advisory Board committee that reviewed the EPA report, when asked about the danger of ETS replied that the "questioner probably incurred a greater risk driving through Washington traffic to ask his question than he would incur in a lifetime's exposure to ETS." John C. Fox, supra note 5, at 628.
[17] While the majority describes these costs as minimal, Majority at 711-712, and adds that this regulation can be complied with cost-free simply by banning smoking, id. at 711 n. 12, it also points out a regulation that banned smoking "would present a different case than this one," id. at 711, while appearing to simultaneously accept a de facto ban as perfectly appropriate. See id. at 712 n. 12 ("One struggles to imagine how a working population composed of a vast majority of nonsmokers would somehow be demoralized by the absence from their workplaces of a substance than can kill them."). The distinction the majority attempts to draw is of degree, not kind, with little difference in degree.
[18] Antismoking regulations have a disproportionate effect upon the poor and African-Americans. Rivka Widerman, Tobacco is a Dirty Weed. Have We Ever Liked It? A Look at Nineteenth Century Anti-Cigarette Legislation, 38 Loy. L.Rev. 387, 421-22 (1992); John C. Fox, supra note 5, at 625 n. 186. In fact, policies limiting workplace smoking may well trigger "`disparate impact' discrimination claims." Id.
[19] Antismoking regulations inspired by ideological zeal have an inglorious history.

The first European caught smoking was imprisoned by the Inquisition. Widerman, supra note 17, at 396. Yet Native Americans, who had been using tobacco since the Fifth Century, did not share in this prejudice. Id. at 395. In 1604 James I (James VI of Scotland) authored the first attack on environmental tobacco smoke. Jacob Sullum, For Your Own Good: The Anti-Smoking Crusade and the Tyranny of Public Health 143 (1998). In Russia, lips were slit for smoking and noses torn away for using snuff, while in Turkey smoking was a capital offense, prompting mass executions by torture which served only to intensify the desire for that which had been forbidden. Id. at 20-21.
In the 1930s and early 1940s the world's strongest antismoking movement was championed by state policy in National Socialist Germany. This is not surprising considering the prevailing emphasis on preservation of the race and Hitler's suggestion that had he not given up smoking Nazism might never have succeeded. Robert N. Proctor, The Anti-Tobacco Campaign of the Nazis: a little known aspect of public health in Germany, 1933-45, 313 Brit. Med. J. 1450, 1450 (1996). Yet even such will was unable to triumph over smoking by propaganda alone as smoking rates actually rose dramatically in the six years after Hitler came to power. Only in the late 1930s and early 1940s was the German state able to reduce smoking though workplace regulations and other extensive bans. Id.
Washington has had its own flirtation with the heady smoke of tobacco prohibition. In 1893, the manufacture, sale, and purchase of cigarettes and cigarette paraphernalia were prohibited. Laws 1893, p. 82, c. 52. This was the first state prohibition on cigarettes enacted in America. Cassandra Tate, Cigarette Wars: The Triumph of "The Little White Slaver" app. at 159 (1999). In 1895 and 1901, extensive regulations on manufacture and sale were enacted. Laws of 1895, p. 125, c. 70; Laws of 1901, p. 261, c. 72. In 1907 a new ban on sale and manufacturing was passed. Laws of 1907, p. 293, c. 148. Apparently unsatisfied, two years later the legislature outlawed mere possession of cigarettes or cigarette papers. Laws of 1909, ch. 249, § 284. However, as is frequently the case with youthful experimentation, the legislature grew up and repealed this total ban in its next session, limiting the tobacco prohibition to those under 21, Laws of 1911, ch. 133, § 1(4). Like other states, Widerman, supra, at 389, Washington has decided to switch rather than fight, and cash in on the cigarette trade by taxation. RCW 82.24; Laws of 1935, ch. 180, § 83. Interestingly, although statutes regulating the sale or manufacturing of cigarettes were in place from 1895-1907 and from 1911 on, the legislature did not actually repeal the 1893 prohibition on the sale, purchase, and manufacturing of cigarettes until 1925. Laws of 1925, Ex.Sess., ch. 17, § 1.