**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NILO D. TUAZON,
                *Plaintiff-Appellee,*

v.

R.J. REYNOLDS TOBACCO COMPANY,
a foreign corporation,
                *Defendant-Appellant.*

No. 04-35618

D.C. No.
CV-03-00929-MJP

OPINION

Appeal from the United States District Court
for the Western District of Washington
Marsha J. Pechman, District Judge, Presiding

Argued and Submitted
October 18, 2005—Seattle, Washington

Filed January 11, 2006

Before: Richard D. Cudahy,* Thomas G. Nelson, and
M. Margaret McKeown, Circuit Judges.

Opinion by Judge McKeown

---

*The Honorable Richard D. Cudahy, Senior United States Circuit Judge
for the Seventh Circuit, sitting by designation.

---

**COUNSEL**

Robert F. McDermott, Jr., Jones Day, Washington, D.C.; Paul S. Ryerson, Jones Day, Washington, D.C.; Karen O. Hourigan, Jones Day, San Francisco, California, for the defendant-appellant.

Jon P. Ferguson, Jon Ferguson Law Group, PLLC, Bainbridge Island, Washington, for the plaintiff-appellee.

---

**OPINION**

McKEOWN, Circuit Judge:

This case calls for us to decide whether R.J. Reynolds Tobacco Company ("Reynolds"), a North Carolina-based corporation that has operated in Washington for more than half a century, may be sued in Washington for its alleged participation in a worldwide conspiracy to deny the addictive and harmful effects of smoking. Nilo D. Tuazon was diagnosed with a chronic lung disorder in 2003 in his native Philippines. The same year, Tuazon established residence in Washington state and brought suit against Reynolds for its alleged conduct that led to his current illness. Reynolds appeals the district court's denial of its motion to dismiss for lack of personal jurisdiction and on grounds of forum non conveniens.

**BACKGROUND**

Nilo D. Tuazon, who was born and lived in the Philippines, started smoking Salem cigarettes at age seventeen and smoked continually for more than forty years. Ten to fifteen

years ago, Tuazon began to experience a chronic cough that left him weak and dizzy, a condition he suspected was smoking-related. Drawing on his own background as a lawyer and businessman, Tuazon began researching cases brought against tobacco companies in the United States.

Tuazon was diagnosed with chronic obstructive pulmonary disorder in 2003. Later that year, he immigrated to the United States on a petition supported by his daughter, a U.S. citizen, and settled with cousins in Renton, Washington. Soon after his arrival, doctors confirmed his diagnosis. Tuazon's treatment continues under the supervision of doctors in the Seattle area.

Reynolds, originally incorporated in New Jersey in 1899, maintains its headquarters in North Carolina. Reynolds has been licensed to do business in Washington since 1940 but has no manufacturing or production facilities in the state. Since at least 1998, Reynolds has maintained an office and up to forty full-time employees in the state. This presence has allowed Reynolds to do substantial business in Washington. From 1998-2002, Reynolds enjoyed a privileged position in the Washington market; it sold between 2.5 and 3 million cigarettes to distributors in Washington annually, generating $145-240 million in net sales each year. Also during this period, Reynolds' market share in Washington was 29-31%, while its national market share was 23-24%. This dominant sales position resulted from a long history of targeting Washington consumers with marketing and advertising campaigns. Since at least 1949, Reynolds has advertised in purely local publications, including the Seattle Times, the Spokane Spokesman Review, and the Tacoma News-Tribune.

Over time, Reynolds' efforts in Washington expanded to include political activity, more extensive market analysis, and sponsored research at the University of Washington. By the 1970s and 80s, Reynolds was conducting sophisticated market research, including focus groups and direct telephone surveys

of smokers in several Washington cities, and providing hundreds of thousands of dollars to the University of Washington to support research into the health-related effects of smoking. In the 1990s, Reynolds organized local opposition to city and state legislation that would have banned or limited smoking and cigarette advertising. More recently, Reynolds identified Washington as a priority market and launched renewed efforts targeted at Washington consumers, spending more than $200,000 in local advertising and giving away more than 200,000 packs of free promotional cigarettes each year.

In addition to its domestic operations, Reynolds has been active overseas through a former affiliate, R.J. Reynolds International, Inc. In the Philippines, Reynolds licensed Fortune Tobacco International, Ltd. ("Fortune Tobacco") to distribute Reynolds brand cigarettes, including Tuazon's preferred brand, Salem.

Tuazon's complaint alleges that Reynolds participated in a global conspiracy to suppress information regarding the addictive and health-related effects of cigarettes. The litigation of similar claims has a long and well-known history in the United States over the past decade. *See, e.g.*, *Strawser v. Atkins*, 290 F.3d 720, 725 (4th Cir. 2002) ("In the 1990s, nearly all the states sued major tobacco companies for harm arising from the deliberate concealment of the health risks posed by tobacco.").[1] Tuazon alleges that the conspiracy involving major tobacco companies originated in the United States and, by the 1970s, had moved abroad. Working through affiliates and subsidiaries, such as the Asian Tobacco Council,

---

[1] As the Fourth Circuit noted in *Strawser*, the states and tobacco companies involved in each case varied. *See* 290 F.3d at 725 n.2. It is not necessary to summarize the history of tobacco litigation here. Information on tobacco-related litigation and the master settlement agreement is made available by the National Association of Attorneys General, at *http:// www.naag.org/backpages/naag/tobacco.* Reynolds also maintains a database on tobacco-related litigation at *http://www.rjrt.com/legal/ litOverview.aspx.*

the Philippines Tobacco Institute, and Fortune Tobacco, Tuazon claims that Reynolds was able to suppress information regarding tobacco's addictive and corrosive health effects. As a result, Tuazon continued smoking for decades despite growing health problems and warnings from friends and family.

Reynolds moved to dismiss Tuazon's complaint for lack of personal jurisdiction and on grounds of forum non conveniens. The district court denied the motion and Reynolds now appeals. The district court certified the question for immediate appeal and we granted Reynolds permission to appeal the district court's order.

## ANALYSIS

## I.  PERSONAL JURISDICTION

We review de novo a district court's decision to exercise personal jurisdiction. *Dole Food Co. v. Watts*, 303 F.3d 1104, 1108 (9th Cir. 2002). Tuazon bears the burden of showing that jurisdiction is appropriate. *Id.* (citing *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990)). Where, as here, the decision was based on written submissions only, without an evidentiary hearing, Tuazon must only make a prima facie showing of facts that would support jurisdiction. *Id.* (citing *Caruth v. Int'l Psychoanalytical Ass'n*, 59 F.3d 126, 128 (9th Cir. 1995)).

Exercise of *in personam* jurisdiction over an out-of-state defendant is limited by the Due Process Clause of the Fourteenth Amendment. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 413-14 (1984) (citing *Pennoyer v. Neff*, 95 U.S. 714 (1878)). The cornerstone of the due process inquiry is an analysis of the defendant's contacts with the selected forum. The famous *International Shoe* case requires "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of

fair play and substantial justice.' " *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

**[1]** A court may exercise specific jurisdiction where the suit "arises out of" or is related to the defendant's contacts with the forum and the defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985); *see also Helicopteros*, 466 U.S. at 414 n.8. In contrast, in a controversy unrelated to a defendant's contacts with the forum, a court may exercise general jurisdiction only where "continuous corporate operations within a state [are] thought so substantial and of such a nature as to justify suit against [the defendant] on causes of action arising from dealings entirely distinct from those activities." *International Shoe*, 326 U.S. at 318; *accord Helicopteros*, 466 U.S. at 414 n.9. The standard for general jurisdiction is high; contacts with a state must "approximate physical presence." *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000). Put another way, a defendant must not only step through the door, it must also "[sit] down and [make] itself at home." *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1125 (9th Cir. 2002).

The parties agree that Tuazon's claim arises from Reynolds' conduct outside of Washington. Consequently, we must decide whether Reynolds' contacts with Washington suffice to support the exercise of general jurisdiction. To this end, we follow a two-step process, asking first, whether Washington's jurisdictional statute confers jurisdiction over Reynolds, and second, whether the exercise of jurisdiction comports with federal due process requirements. *Amoco Egypt Oil Co. v. Leonis Navigation Co.*, 1 F.3d 848, 850 (9th Cir. 1993).

## A.    Washington's Jurisdiction Statute

**[2]** Washington courts apply the service of process statute, rather than the long-arm statute, to determine whether general jurisdiction applies. Rev. Code Wash. § 4.28.080(10). The statute confers general jurisdiction over a corporation that is "doing business" in the state. *Crose v. Volkswagenwerk AG*, 558 P.2d 764, 765-66 (Wash. 1977). A company is doing business in Washington when it participates continuously and substantially in the state's markets. *Id.* at 766. The Washington Supreme Court has no rigid or formulaic test for determining when a company is "doing business" in Washington, and instead conducts a fact-intensive, case-by-case analysis. *Id.* at 767.[2]

In *Crose* and more recent cases, Washington courts have set guideposts to aid our inquiry. Crose involved a products liability lawsuit filed by a Washington resident against Volkswagen, a German corporation, arising from an injury in California. Volkswagen did not sell its products directly to Washington consumers, but only to an Oregon distributor. Despite this attenuated relationship, the Washington Supreme Court held that there was general jurisdiction under 4.28.080(10) because Volkswagen generated substantial revenue from a "well-organized, fully-integrated worldwide chain of distribution." *Id.*

More recent cases have relied on other factors in finding

---

[2]In broad terms, the *Crose* analysis looks to five factors, including: (1) the interest of the state in providing a forum for its residents, (2) the ease with which the plaintiff could access another jurisdiction, (3) the amount, kind, and continuity of activities by the defendant in the state, (4) the significance of the economic benefits flowing from the defendant's in-state activities, and (5) the foreseeability of injury resulting from the use of the defendant's products. *Crose*, 558 P.2d at 768; *see also Hartley v. American Contract Bridge League*, 812 P.2d at 109, 112-13 (Wash. Ct. App. 1991). Washington courts regularly consider only the third factor in determining whether to exercise general jurisdiction. *Id.* at 113.

substantial and continuous contacts. In *Hartley v. American Contract Bridge League*, 812 P.2d 109 (Wash. Ct. App. 1991), the defendant's contacts were deemed continuous and substantial where it sold and transported goods to support bridge tournaments it organized in Washington and collected fees and dues from Washington residents. *Id.* at 112. The defendant's contacts also met the standard in *Hein v. Taco Bell*, 803 P.2d 329 (Wash. Ct. App. 1991); the defendant had been registered to do business in Washington for more than twenty years, owned a chain of restaurants, and depended on local markets and government infrastructure to support its business. *Id.* at 330-31.

**[3]** In contrast, where in-state activity is singular, passive, or collateral to a business's principal efforts, Washington courts have refused jurisdiction. For example, one court held that a company's limited efforts to solicit visits to Opryland (Tennessee), commission payments to Washington-based travel brokers, and occasional broadcasts of music were not "continuous and substantial" contacts sufficient to subject the defendant to general jurisdiction in Washington. *Banton v. Opryland U.S.A., Inc.*, 767 P.2d 584, 588-89 (Wash. Ct. App. 1989), *overruled on other grounds* by *Shute v. Carnival Cruise Lines*, 783 P.2d 78, 82 (Wash. 1989). In *Osborne v. Spokane*, the court found that deriving revenue from sales in Washington that accounted for less than 1% of the company's regional revenue was insufficient to justify the exercise of general jurisdiction over a Canadian insurance brokerage firm because that revenue was not accompanied by indicia of other systematic and continuous contacts. 738 P.2d 1072, 1074-75 (Wash. Ct. App. 1987), *rev'd on other grounds*, *Scott Fetzer Co. v. Weeks*, 786 P.2d 265, 267 (Wash. 1990).

**[4]** Close cases exist, but this is not one of them. Taken together, Reynolds' activities are very close to those of the defendants in *Hartley* and *Hein*. Unlike the defendants in *Banton* and *Osborne*, Reynolds does not attract customers or generate revenue on the basis of limited or passive contacts.

As in *Hartley* and *Hein*, Reynolds does business in Washington with a long-established presence that generates substantial revenue and reaches many in-state consumers.

**[5]** We are not convinced by Reynolds' argument that its contacts in Washington were "continuous" but not "substantial." Reynolds has been licensed to do business in Washington for decades, maintains an office and a staff of permanent employees, advertises in purely local media, targets Washington consumers, and derives $145-240 million in annual revenues from sales in Washington. In short, we hold that Reynolds' activities in Washington constitute "doing business" within the meaning of the Washington service of process statute.

## B. DUE PROCESS ANALYSIS

**[6]** Our inquiry does not end with the Washington statute. The Due Process Clause allows *in personam* jurisdiction to be exercised over a non-resident corporate defendant only if it has "certain minimum contacts" with the forum state such that "the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *Helicopteros*, 466 U.S. at 414 (citing *International Shoe*, 326 U.S. at 316). In applying this standard, we employ yet another familiar two-part test: whether Reynolds has sufficient contacts with Washington and whether the exercise of jurisdiction is reasonable in this case. *Asahi Metal Indus. Co., Ltd. v. Superior Ct. of Cal.*, 480 U.S. 102 (1987).

### 1. MINIMUM CONTACTS

**[7]** In the context of general jurisdiction, minimum contacts exist where a defendant has "substantial" or "continuous and systematic" contacts with the forum state, even if the case is unrelated to those contacts. *Helicopteros*, 466 U.S. at 415. The reach of general jurisdiction is defined, in the first instance, by the Supreme Court's decisions in *Perkins v.*

*Benguet Consol. Mining Co. et al.*, 342 U.S. 437 (1952), and in *Helicopteros*.

In *Perkins*, the Court sketched for the first time a vision of personal jurisdiction that did not arise from the occurrence of the cause of action in the forum state. *Id.* at 446 ("The instant case takes us one step further to a proceeding *in personam* to enforce a cause of action not arising out of the corporation's activities in the state of the forum") (quoting *International Shoe*, 326 U.S. at 318-19 ("[T]here have been instances in which the continuous corporate operations within a state were thought so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities")). During World War II, the president of a Philippine mining company established an office in Ohio during the Japanese occupation of the Philippines. At his office-in-exile in Ohio, the president:

> kept company files and held directors' meetings in the office, carried on correspondence relating to the business, distributed salary checks drawn on two active Ohio bank accounts, engaged an Ohio bank to act as transfer agent, and supervised policies dealing with the rehabilitation of the corporation's properties in the Philippines.

*Helicopteros*, 466 U.S. at 415 (*citing Perkins*, 342 U.S. at 438, 445). Applying the principles of *International Shoe*, the Supreme Court upheld the exercise of jurisdiction by an Ohio court in a cause of action unrelated to the mining company's activities there.

At the other end of the spectrum, the Court deemed the defendant's contacts insufficient to justify the exercise of general jurisdiction in *Helicopteros*. 460 U.S. at 418-19. Defendant Helicopteros faced a wrongful death suit in state court in Texas arising from a helicopter crash in Peru. Helicopteros's contacts with Texas consisted of one meeting in Houston by

its president to discuss a contract, significant purchases of helicopters, spare parts and accessories, training sessions for pilots and managers, and limited banking activities over a seven-year period. *Id.* at 410-11. At the time of the lawsuit, the company had never:

> been authorized to do business in Texas . . . had an agent for the service of process . . . performed helicopter operations in Texas or sold any product that reached Texas, . . . solicited business in Texas, . . . signed any contract in Texas, . . . had any employee based there, . . . recruited an employee in Texas . . . owned real or personal property in Texas . . . maintained an office or establishment there . . . maintained . . . records in Texas and [had] no shareholders in that State.

*Id.* at 411. On these facts, the Court rejected the Texas Supreme Court's conclusion that Helicopteros had sufficient contacts with Texas, holding that "purchases and related trips, standing alone, are not a sufficient basis for a State's assertion of jurisdiction." *Id.* at 417.

Navigating the territory between *Perkins* and *Helicopteros* requires us to balance the facts of each case. *Cf. Kulko v. Superior Ct. of Cal.*, 436 U.S. 84, 92 (1978) ("[T]he 'minimum contacts' test of *International Shoe* is not susceptible to mechanical application; rather, the facts of each case must be weighed to determine whether the requisite 'affiliating circumstances' are present."). In evaluating general jurisdiction, we have not developed a precise checklist or articulated a definitive litany of factors. We consider, among other factors, "whether the defendant makes sales, solicits or engages in business in the state, serves the state's markets, designates an agent for service of process, holds a license, or is incorporated there." *Bancroft & Masters*, 223 F.3d at 1086. It is the nature and extent of the contacts that determines whether they are "substantial" or "continuous and systematic." Longevity, con-

tinuity, volume, economic impact, physical presence, and integration into the state's regulatory or economic markets are among the indicia of such a presence.

Although courts have been understandably reluctant to exercise general jurisdiction, *cf. Amoco Egypt*, 1 F.3d at 851 n.3 (noting that "[t]he Supreme Court has upheld general jurisdiction only once"), the requisite showing has been sustained in a number of cases. For example, the Federal Circuit held that the Due Process Clause was satisfied for purposes of general jurisdiction where a defendant employed multiple distributors in the state and generated millions of dollars in annual revenues from in-state sales. *LSI Indus. v. Hubbell Lighting, Inc.*, 232 F.3d 1369, 1375 (Fed. Cir. 2000). In *Lakin v. Prudential Securities*, 348 F.3d 704 (8th Cir. 2003), the defendant was a federally-chartered savings bank with its principal place of business in Georgia, but haled to court in Missouri to face claims arising from a multi-million dollar, multi-state fraud. The Eighth Circuit held that Georgia-based Prudential's contacts with Missouri were continuous and substantial based on the fact that its $10 million home-equity loan portfolio in the state implied multi-year lending relationships with "hundreds, if not thousands of Missouri residents." *Id.* at 709. Noting also that the home-equity market was central to Prudential's business, the court remanded for additional jurisdictional discovery. *Id.* at 709-710; *see also Provident Nat'l Bank v. Lehman Mgmt. Co.*, 819 F.2d 434, 438 (3d Cir. 1987) (holding general jurisdiction proper where the defendant had no property in Pennsylvania and conducted no advertising and only a small percentage of its business in the state, but "the nature of [defendant's] contacts with Pennsylvania . . . was central to the conduct of its business.").

Yet another example of general jurisdiction is found in *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560 (2d Cir. 1996). Over a four-year period, the defendant's contacts with Vermont, the forum state, included sales of $4 million, ongoing relationships with five authorized dealers for

its products in the state, product support for its dealers, national advertising that reached Vermont, direct marketing to at least three Vermont firms, and more than one hundred visits by employees to Vermont. *Id.* at 570. The defendant owned no property in Vermont and did not control its authorized dealers there. *Id.* at 572.

The Second Circuit acknowledged that any one of these facts alone might have been an insufficient contact, but held that "*when taken together*, [the contacts] are sufficient to establish general jurisdiction." *Id.* at 570 (emphasis in original). The court nevertheless dismissed the case because jurisdiction would have been unreasonable where neither the plaintiff nor the defendant resided in Vermont, the state of Vermont had no discernable interest in the case, and the plaintiff's only interest in Vermont as a forum seemed to be a generous statute of limitations. *Id.* at 574. Tuazon's case is strikingly different in terms of the reasonableness analysis, as noted below.

As this review of cases illustrates, determining whether a corporate defendant's contacts in a particular case are substantial and continuous turns on the "economic reality of the defendants' activities rather than a mechanical checklist."[3] *Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1331 (9th Cir. 1984). Generally, an isolated contact with the forum state, among those identified in *Bancroft & Masters*, will not support general jurisdiction. *See, e.g.*, *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1124-25

---

[3]Although there is a lively academic debate about the contours of general jurisdiction, *see e.g.*, Mary Twitchell, The Myth of General Jurisdiction, 101 Harv. L. Rev. 610 (1988); Patrick J. Borchers, The Problem with General Jurisdiction, 2001 U. Chi. Legal F. 119 (2001), the lower courts have hewed to the principles set out as bookends by the Supreme Court and filled in the middle ground through a case-by-case review of individualized circumstances. Although it may be frustrating to some commentators that no formula has emerged, the circumstances vary so widely that a mechanical application of factors and principles would be unprincipled.

(9th Cir. 2002) (holding that there was no general jurisdiction where a defendant's only contacts with California amounted to sixteen shipments of rice sold through an independently employed sales agent); *Congoleum Corp. v. DLW Aktiengesellschaft*, 729 F.2d 1240, 1242 (9th Cir. 1984) (noting that "no court has ever held that the maintenance of even a substantial sales force within the state is a sufficient contact to assert jurisdiction in an unrelated cause of action"); *Bancroft & Masters*, 223 F.3d at 1086 (concluding that "occasional, unsolicited sales of tournament tickets and merchandise to California residents" and maintenance of a small number of license agreements with California vendors was insufficient to support general jurisdiction).

**[8]** Reynolds' contacts in Washington are perhaps less than the wartime "home away from home" involved in *Perkins*, yet far more substantial than the defendant's limited contacts with Texas in *Helicopteros*. In analyzing the breadth and depth of Reynolds' contacts with Washington, we begin by noting that Reynolds' sales in Washington are not limited or occasional. Reynolds has had a serious presence in Washington for more than a half-century and generates enormous revenues from Washington—hundreds of millions of dollars in annual net sales in recent years. *Cf. LSI Indus.*, 232 F.3d at 1374 (general jurisdiction exists where, among other factors, the defendant generated several millions of dollars in annual sales in the forum state); *Metropolitan Life Ins. Co.*, 84 F.3d at 570 (general jurisdiction appropriate where defendant sold nearly $4 million in products in the forum state over a four-year period).

Reynolds' long and successful operations are not accidental. The company did not hide in its North Carolina home, passively trickling a small supply of cigarettes to Washington. *See, e.g.*, *Sandstrom v. Chemlawn Corp.*, 904 F.2d 83, 88 (1st Cir. 1990) (no substantial and continuous contacts where defendant's presence in forum state was limited to being licensed to do business and purchasing limited advertisements); *Consolidated Dev't Corp. v. Sherritt, Inc.*, 216 F.3d

1286, 1292 (11th Cir. 2000) (no substantial and continuous contacts where defendant's presence in the United States was limited to capital market transactions, appointing an agent for service of process, and sales of products through a subsidiary). The magnitude of Reynolds' operations and sales in Washington reflects an undeniable presence in the state; it has held a license to do business there since 1940, has advertised in purely local publications since at least the 1950s, has engaged in local political activity to protect its market, and maintains a permanent office and workforce in the state. *Cf. Schreiber v. Allis-Chalmers Corp.*, 611 F.2d 790, 793 (10th Cir. 1979) (reversing the district court's dismissal for lack of general personal jurisdiction where the defendant had been licensed to do business in the forum state for almost forty years, had conducted sales and sales promotions, and had recently established a factory there).

**[9]** Selling cigarettes is Reynolds' core business, in Washington and elsewhere. *Cf. Lakin*, 348 F.3d at 709; *Provident Nat'l Bank*, 819 F.2d at 438. Indeed, with the exception of incorporation, each factor identified in *Bancroft & Masters* is present in abundance. *See* 223 F.3d at 1086. It is also significant that the essence of Tuazon's complaint—a worldwide coverup regarding tobacco risks—cannot be characterized as "dealings entirely distinct" from Reynolds' business in Washington. *International Shoe*, 326 U.S. at 319. The tobacco litigation, in which Washington state was a major player, centered around some of these same allegations. Even after the global settlement, Reynolds participated in a court challenge in Washington involving state regulation of smoking. *See Aviation West Corp. v. Dep't of Labor and Indus.*, 980 P.2d 701 (Wash. 1999).

Reynolds urges that it is conducting business "with" Washington in some way that is meaningfully distinct from doing business "in" the state. Reynolds describes the former as "merely interacting with a limited number of customers or suppliers" in a state. *See Bancroft & Masters*, 223 F.3d at

1086 (holding that a company that "continues to have license agreements with two television networks and a handful of California vendors" was "doing business with California, but . . . not . . . doing business in California"). Although limited sales and licensing arrangements alone may be insufficient to establish general jurisdiction, Reynolds' decades long presence and its integration into Washington's markets can hardly be characterized as "mere" interaction with the state.

Finally, we are not persuaded by Reynolds' argument that affirming the district court would obliterate the distinction between general and specific jurisdiction. Although general jurisdiction is infrequently exercised, to conclude that it exists here does not mean that every case of failed specific jurisdiction will lead to the grant of general jurisdiction. The determination simply depends upon the nature and extent of the contacts. It is abundantly clear that a corporation does not necessarily submit to general jurisdiction in every state in which it merely sells a product. But, jurisdiction here is not predicated on sales, or even the notion of substantial sales, alone. The minimum contacts are established by the confluence of Reynolds' physical, economic, and political presence and the company's myriad other activities in the state.

[10] In short, we hold that Reynolds' continuous and substantial contacts are sufficient to support the exercise of general jurisdiction.

## 2. REASONABLENESS

[11] In the second step of our inquiry, we determine whether the exercise of general jurisdiction in this case is reasonable.[4] Here, the burden is the defendant's to " 'present a com-

---

[4]Reynolds objects that the district court did not recite the five *Asahi* factors, arguing that the consequences of this absence are "profound." We acknowledge Reynolds' concern but do not share its conclusion. The district court stated that the due process analysis did not end with minimum contacts and went on to discuss other factors generally recognized as reasonableness factors. It is also well-established that we may affirm a district court decision "on any basis supported by the record." *Amoco Egypt*, 1 F.3d at 851 n.3.

pelling case' that the exercise of jurisdiction would, in fact, be unreasonable." *Amoco Egypt*, 1 F.3d at 852; *accord Burger King*, 471 U.S. at 477. In accord with the Supreme Court's guidance in *Asahi*, we consider five factors: (1) the burden on the defendant, (2) the forum state's interest in the dispute, (3) the importance of the chosen forum to the plaintiff's interest in obtaining relief, (4) the most efficient forum for judicial resolution of the dispute, and (5) the "shared interest of the several States in furthering fundamental substantive social policies."[5] 480 U.S. at 113. Balancing these factors, we conclude that Reynolds has failed to meet its burden of demonstrating a compelling case of unreasonable jurisdiction. The exercise of jurisdiction here is reasonable and satisfies the requirements of the Due Process Clause.

[12] We look first to the burden on the defendant of litigating in the chosen forum. Reynolds does not identify any specific hardship or otherwise comment on this factor, thus abdicating its burden on this point. Evaluation of this burden often contemplates a foreign, as in non-U.S., defendant haled to court in the United States. In such cases, "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Asahi*, 480 U.S. at 114. Surely the

---

[5]The Ninth Circuit considers two other factors in assessing the reasonableness of jurisdiction: the extent of purposeful interjection and the existence of an alternative forum. *Amoco Egypt*, 1 F.3d at 851. The first factor is the extent of Reynolds' purposeful interjection into Washington. This inquiry "parallels the question of minimum contacts." *Id.* at 852. Because Reynolds has minimum contacts with Washington, this factor weighs in favor of jurisdiction. The second factor asks whether an adequate alternative forum exists for the resolution of the dispute. This question is at the heart of the forum non conveniens analysis and is discussed in the next section. Although, as discussed below, Reynolds arguably has met its burden with respect to establishing the Philippines as an available alternative forum, this single factor would not trump the other factors so as to compel a different conclusion.

burden on Reynolds of litigating in the Philippines would be, by degrees of magnitude, greater than litigating in Washington state. Reynolds does not suggest that the burden is one to be weighed between Washington and North Carolina. With its long history and substantial business in the state, litigating in Washington would not be an onerous burden for Reynolds. *Cf. Bancroft & Masters*, 223 F.3d at 1082 (determining jurisdiction to be reasonable when a Georgia corporation demonstrated no hardship in litigating in California); *Harris Rutsky & Co. Ins. Svcs. Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1132-33 (9th Cir. 2003) (observing that litigating in California posed only a limited burden to a London-based company, where its employees traveled there regularly for business).

**[13]** The second factor, a state's interest in providing a forum for its residents, weighs in favor of reasonableness. Tuazon lawfully immigrated to Washington and has taken up residence there; Washington rightfully takes an interest in his well-being and in this dispute. *See Dole Food*, 303 F.3d at 1116-17. Reynolds argues that Washington's interest is limited because Tuazon arrived with a fully mature claim resulting from conduct and harm entirely outside of Washington. Reynolds also impugns Tuazon's motives for moving to Washington, despite the long immigration process and the presence of his family in Washington. This argument begs the question—Tuazon now lives in Washington as a legal resident. Reynolds' theory not only ignores the fact of our mobile society but would create a novel jurisdictional hurdle by requiring the suit to be brought where the disease matures.

**[14]** The third factor favors a forum that can provide convenient and effective relief for the plaintiff. It is easy for Tuazon to litigate his claim where he resides—Washington. The potential inconvenience of litigating in the Philippines (the only alternative that has been suggested) is mitigated by Tuazon's long history and deep connections with his country of origin. Although a plaintiff's choice of home forum is entitled to deference in a forum non conveniens analysis, *Piper Air-*

*craft Co. v. Reyno*, 454 U.S. 235, 257 (1981), we are less deferential when determining reasonableness under personal jurisdiction. *Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1490 (9th Cir. 1993) ("A mere preference on the part of the plaintiff for its home forum does not affect the balancing"); *but see Asahi*, 480 U.S. at 114 ("When minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant."). On the other hand, it is significant that Reynolds has not seriously argued that litigating in Washington is more of a burden than being in the Philippines. Thus, this factor is hardly a basis to support a finding of unreasonableness.

[15] The fourth factor requires us to consider the most efficient judicial resolution for this case. "The site where the injury occurred and where evidence is located usually will be the most efficient forum." *Pacific Atl. Trading Co. v. M/V Main Express*, 758 F.2d 1325, 1331 (9th Cir. 1985). No clear winner emerges in this category, although we credit the district court's findings that, on balance, Washington state provides an efficient and viable forum to resolve Tuazon's claims. Even though Tuazon's injury occurred in the Philippines, his claim will require the presentation of evidence and testimony from far-flung regions, including Reynolds' headquarters in North Carolina and other sites where the alleged conspiracy was nurtured (such as New York), as well as Manila and perhaps other locales in the Philippines, and in Washington itself, where Tuazon has been treated by local doctors since his arrival in 2003. Resolving Tuazon's claims may require a court to apply the law of the Philippines to some or all of the substantive dispute. Admittedly, these factors may present some difficulties for a court in Washington, but it is not significantly easier for any other court to hear this case. For instance, it would not be a simple matter for a civil tribunal in the Philippines to exercise compulsory process upon Reynolds executives in North Carolina. It is neither

impractical nor unreasonable for Washington to exercise jurisdiction.

The fifth factor calls for us to consider the shared interest of the several states in advancing social policy. While the "minimum-contacts analysis presupposes that two or more States may be interested in the outcome of a dispute," the conflict of one forum's interests with the "fundamental substantive social policies" of another state may usually be handled through choice-of-law analysis rather than rejecting jurisdiction. *Burger King*, 471 U.S. at 477, 483 n.26. What is missing here is evidence of any real or purported conflict.

Reynolds struggles to cast this controversy as one implicating high diplomacy and the sovereignty of a foreign nation, arguing that the district court erred in failing to consider the interest of the Republic of the Philippines. True, this factor often involves conflicts with the sovereignty of foreign nations, but usually when the foreign country is home to the defendant. *See, e.g.*, *Amoco Egypt*, 1 F.3d at 852 ("Where, as here, the defendant is from a foreign nation rather than another state, the sovereignty barrier is high and undermines the reasonableness of personal jurisdiction."). Reynolds attempts to sidestep this distinction by arguing that it would be unfair to the Philippines to prevent Tuazon's case from being adjudicated there. Yet, it is Tuazon, a Philippine citizen, who decided to bring suit in the United States seeking personal damages from an alleged worldwide conspiracy. Contrary to Reynolds' assertions, it is difficult to see how an American court tramps on the sovereignty of the Philippines by exercising jurisdiction over an *American* company on a claim by an *American* resident.

**[16]** From the standpoint of social policy, Washington has an interest in a suit involving an alleged coverup by a tobacco company. Not only is Tuazon a Washington resident, Washington was a key participant in the global tobacco settlement, which involved related health policy issues. This is not to say

that the Philippines has no social policy interest in the issues raised by the suit. Nonetheless, a weighing of factors does not tip this factor in favor of the Philippines.

[17] Taking the factors together, we have no difficulty concluding that the exercise of jurisdiction in Washington is reasonable.

## II.  FORUM NON CONVENIENS

[18] Reynolds also sought relief on the basis of forum non conveniens. "A district court has discretion to decline to exercise jurisdiction in a case where litigation in a foreign forum would be more convenient for the parties." *Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1142 (9th Cir. 2001). In exercising this discretion, a court will consider whether an adequate alternate forum exists and whether the balance of public and private interests favors a different forum. *Id.*

Reynolds faces a doubly difficult task in appealing the district court's rejection of the forum non conveniens challenge. As an initial hurdle, the plaintiff's choice of forum is entitled to deference.[6] *Piper Aircraft*, 454 U.S. at 257. And "where the court has considered all relevant public and private interest factors, and where its balancing of these factors is reasonable, its decision deserves substantial deference." *Lueck*, 236 F.3d at 1143. We will reverse the district court's determination only where "there has been a clear abuse of discretion." *Id.*

---

[6]Reynolds' argument that Tuazon should not enjoy this deference because he is a foreign citizen is at odds with the Supreme Court's direction on this issue. In the context of forum non conveniens analysis, a resident alien such as Tuazon is entitled to the same deference as a citizen. *Piper Aircraft*, 454 U.S. at 256 n.23 ("Citizens *or residents* deserve somewhat more deference than foreign plaintiffs . . .") (emphasis added). In assessing convenience, the distinction is between resident or citizen plaintiffs (Tuazon's category) and foreign plaintiffs. *Id.* Tuazon is not a "foreign" plaintiff.

### A. ADEQUATE ALTERNATIVE FORUM

Reynolds bears the burden of demonstrating that an alternative forum exists and that it is adequate. *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 499 n.22 (9th Cir. 2000). Generally, an alternative forum is available where the defendant is amenable to service of process and the forum provides "some remedy" for the wrong at issue. *Lueck*, 236 F.3d at 1143 (quoting *Piper Aircraft*, 454 U.S. at 254 n.22). This test is easy to pass; typically, a forum will be inadequate only where the remedy provided is "so clearly inadequate or unsatisfactory, that it is no remedy at all." *Lockman Found. v. Evangelical Alliance Mission*, 930 F.2d 764, 768 (9th Cir. 1991) (*quoting Piper Aircraft*, 454 U.S. at 254).

The district court determined that Reynolds failed to show that the Philippines was an adequate alternative forum on two counts—failure to submit to service of process and failure to counter evidence of corruption in the Philippine court system. Before the district court, Reynolds sought primarily dismissal without conditions, but also argued in the alternative that if conditions were imposed, the court should not require waiver of "all defenses . . . available . . . at the time plaintiff originally filed this action." Although there may have been some ambiguity, purposeful or otherwise, in Reynolds' position, the acceptance of jurisdiction need not be absolute. A careful reading of the record confirms Reynolds' consent to service of process in the Philippines. A moving party does not forfeit its consent to service by seeking accommodations as part of the dismissal. With ample discretion to tailor any conditions of dismissal, the district court in this case could have done so. *See Contact Lumber Co. v. P.T. Moges Shipping Co.*, 918 F.2d 1446, 1450 (9th Cir. 1990) (holding the Philippines was an available forum where the district court granted a motion to dismiss "on the express condition that [defendant] consent to the jurisdiction of the Philippine courts"). Accordingly, we conclude that Reynolds established its voluntary submission to service of process.

The district court also found that Reynolds failed to bear its burden in establishing the Philippines as an adequate forum. This showing requires the defendant to establish that the foreign forum's laws provide potential redress for the injury alleged; the fact that the substantive law may be less favorable is relevant only if it would completely deprive plaintiffs of any remedy or would result in unfair treatment. *Piper Aircraft*, 454 U.S. at 255; *Creative Tech., Ltd. v. Aztech Sys. PTE, Ltd.*, 61 F.3d 696, 701-02 (9th Cir. 1995).

**[19]** To meet its burden, Reynolds offered an extensive affidavit by a former Justice of the Philippine Court of Appeals, detailing background about the Philippines and its court system, the availability of contract and tort relief, the discovery process, and procedural formalities. Under our precedent, this showing is sufficient. *Lueck*, 236 F. 3d at 1143 (the district court, in deciding a forum non conveniens motion, is required to ask "whether [the alternative forum] offers a remedy for their losses").

In response, Tuazon argued that the Philippine courts are too corrupt and plagued with delays to provide an adequate forum. Tuazon's assertions about the court system rest primarily on his own experience as a lawyer and businessman in the Philippines. He concedes that he prefers a U.S. court because damages in the Philippines are "niggardly," a ground that we have rejected in the forum non conveniens analysis. *Lueck*, 236 F.3d at 1144 (rejecting argument that lower damages would render a forum inadequate).

In his deposition, Tuazon referred to lengthy delays of up to thirty years in civil proceedings that would make any remedy essentially meaningless. *Cf. Bhatnagar v. Surrendra Overseas Ltd.*, 52 F.3d 1220, 1228 (3d Cir. 1995) ("Wherever the line might be drawn separating tolerable delay from intolerable—that is, delay that does not vitiate a remedy and that which does—delays of up to a quarter of a century fall on the intolerable side of that line."). Notably, however, he

failed to mention a single episode that he directly observed or of which he has personal knowledge. His corruption claims face the same evidentiary void. Indeed, it is difficult to square Tuazon's testimony about his satisfaction with the court system in several actions that he litigated in the Philippines, some all the way to the Supreme Court, with the general allegations in his brief about corruption. Tuazon's anecdotal evidence of corruption and delay provides insufficient basis for the district court's dramatic holding that the courts of the Philippines are an inadequate forum in this civil case.

With no personal testimony on corruption, Tuazon instead offers State Department Country Reports that reference corruption, judicial bias and inefficiency, and the potentially improper influence that corporate defendants wield over the judicial process. Without diminishing the gravity of such concerns, we note that the reports are focused on human rights in the Philippines, and the criminal justice system in particular. As with Tuazon's testimony on delay, such a general indictment provides insufficient substance to condemn the adequacy of Philippine courts in the face of the expert evidence offered by Reynolds.

A litigant asserting inadequacy or delay must make a powerful showing. *Cf. Eastman Kodak Co. v. Kavlin*, 978 F. Supp. 1078, 1084 (S.D. Fla. 1997) (noting that the argument that "[t]he 'alternative forum is too corrupt to be adequate' . . . does not enjoy a particularly impressive track record.") (collecting cases). A close reading of this case, relied on by both Tuazon and Reynolds, is instructive. The court held that corruption and delay in the Bolivian courts made a fair trial impossible. The proof offered was both specific and sordid, unlike the evidence here. The plaintiff offered statements by the Minister of Justice that Bolivian courts were instruments of extortion, detailed affidavits by two experts in Bolivian legal and political affairs, and an affidavit by a former legal counsel to the Bolivian legislature observing that "corruption is endemic to the judicial system of Bolivia." *Id.* at 1085. We

are aware of only one other federal case to hold that an alternative forum was inadequate because of corruption. *See Bhatnagar*, 52 F.3d at 1226-27, 1235 (affirming the district court's determination that India was an inadequate forum and noting reliance on two expert affidavits stating that the Indian legal system was in "virtual collapse" and suffered delays of 15-20 years on average).

**[20]** Indeed, in a particular case, the evidence may well support the conclusion that a legal system is so fraught with corruption, delay and bias as to provide "no remedy at all"; but the paltry evidence offered by Tuazon does not defeat Reynold's showing of adequacy.[7] In summary, this record does not support the district court's finding of inadequacy and we hold that Reynolds satisfied its burden to demonstrate the existence of an adequate alternative forum in the Philippines.

## B.  The Balance of Public and Private Interest Factors

Even when an adequate alternative forum exists, we will not disturb the plaintiff's original choice of forum "unless the 'private interest' and the 'public interest' factors strongly favor" dismissal. *Lueck*, 236 F.3d at 1146 (*citing Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509 (1947)). As we explained recently, a plaintiff need not select the optimal forum for his claim, but only a forum that is not so oppressive and vexatious to the defendant "as to be out of proportion to plaintiff's convenience." *Ravelo Monegro v. Rosa*, 211 F.3d 509, 514

---

[7]In a long list of cases in this and other circuits, the Philippines has been found to be an adequate forum. *See, e.g.*, *Contact Lumber*, 918 F.2d at 1450; *Cruz v. Maritime Company of the Philippines*, 549 F. Supp. 285, 289 (S.D.N.Y. 1982); *Quintero v. Klaveness Ship Lines*, 914 F.2d 717, 728 (5th Cir. 1990); *Transunion Corp. v. Pepsico, Inc.*, 604 F. Supp. 1211, 1216-20 (S.D.N.Y. 1986); *Cuevas v. Reading & Bates Corp.*, 577 F. Supp. 462, 476 (S.D. Tex. 1983); *Jose v. M/V Fir Grove*, 801 F. Supp. 349, 352-53 (D. Ore. 1991). Although these cases are not dispositive as to the evidence here, they are certainly illustrative.

(9th Cir. 2000) (reversing forum non conveniens dismissal, without discussing adequacy or availability of alternate forum, because the private interest factors weighed heavily against dismissal).[8] With this principle in mind, we turn to examine the weight of the private and public interest factors implicated by Tuazon's lawsuit.

Having already navigated several two-part tests and various multi-part tests in the jurisdictional analysis, we now tackle a seven-part test to evaluate private interest factor considerations: (1) the residence of the parties and witnesses, (2) the forum's convenience to the litigants, (3) access to physical evidence and other sources of proof, (4) whether unwilling witnesses can be compelled to testify, (5) the cost of bringing witnesses to trial, (6) the enforceability of the judgment, (7) any practical problems or other factors that contribute to an efficient resolution. *Lueck*, 236 F.3d at 1145 (*citing Gulf Oil*, 330 U.S. at 508). In applying these factors, "[t]he district court should look to any or all of the above factors which are relevant to the case before it, giving appropriate weight to each." *Id.* This guidance grants the district court the broadest possible discretion.

---

[8]*See also Lony v. E.I. Du Pont de Nemours & Co.*, 935 F.2d 604, 608, 615 (3d Cir. 1991) (reversing the district court's forum non conveniens dismissal where Germany offered an adequate alternative forum, but the private and public interest factors, while "relatively close," were "not sufficient to overcome the strong ground for retention of jurisdiction"); *In re Ford Motor Co. and Bridgestone/Firestone North American Tire, LLC*, 344 F.3d 648, 652-53 (7th Cir. 2002) (on deferential mandamus review upholding denial of forum non conveniens motion where at least one alternative forum was adequate and the district court did not err in concluding that private and public interest factors favored venue in the United States); *SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.*, 382 F.3d 1097, 1100 n.9, 1104 (11th Cir. 2004) (reversing forum non conveniens dismissal where the district court failed to grant proper deference to the plaintiff's choice of forum, even though the adequacy of Spain as an alternate forum was not at issue).

The district court found that dismissal was not warranted because "it is not more convenient to try the case in the Philippines" based on the private interest factors. Neither party is a resident of the Philippines; both reside in the United States. Most importantly, Tuazon is a resident of Washington, a more convenient forum for both sides than the Philippines. It is neither unimaginable nor unreasonable that Reynolds, having operated in the state for a half-century, should defend a lawsuit there.

The third and fourth private interest factors, concerning the location and availability of evidence and witnesses, present closer questions. Reynolds makes much of the lack of compulsory process to secure key witnesses and documents in the Philippines. In response, Tuazon argues that the bulk of evidence regarding the alleged conspiracy is likely in the United States. The crucial focus is not on "the number of witnesses or quantity of evidence in each locale," but rather "the materiality and importance of the anticipated [evidence and] witnesses' testimony and then determine[ ] their accessibility and convenience to the forum." *Lueck*, 236 F.3d at 1146 (quoting *Gates Learjet*, 743 F.2d at 1335-36).

As the district court observed, evidence will be drawn from both sides of the Pacific. Proof of Reynolds' participation in a global conspiracy likely will be in North Carolina and other United States locations. Proof of Tuazon's medical condition is in Washington. Evidence of Tuazon's medical history and smoking habits, as well as Reynolds' activities in the Philippines and relationship with Fortune Tobacco, will be in the Philippines. Key witnesses from Reynolds and, of course, Tuazon himself, live in the United States.

Although the Philippines is not a party to the Hague Convention on the Service Abroad of Judicial and Extra Judicial Documents in Civil or Commercial Matters, 20 U.S.T. 361 (1965), evidence there may be obtained through voluntary deposition or compelled by letters rogatory. *See*

United States Department of State, Philippines Judicial Assistance, *available at* http://travel.state.gov/law/info/judicial/judicial_660.html. Also, Tuazon has offered to help Reynolds obtain documents personal to him that are located in the Philippines. Any court, whether in the United States or in the Philippines, will necessarily face some difficulty in securing evidence from abroad. The administrative challenges faced by the district court in Washington are not so great as to justify dismissal. Thus, the third and fourth factors weigh in favor of Washington.

**[21]** On balance, the economics of bringing a few witnesses from the Philippines to Washington will be less costly than moving the trial apparatus, including both parties and witnesses, from all over the United States to the Philippines. Finally, the district court noted that no evidence had been presented about the enforceability of a Philippine judgment in the United States,[9] and that trial in the Philippines would face a lengthy delay. We agree with the district court that the combination of all of these factors counsels in favor of Washington, not the Philippines.

In addition to the private interest factors, we must consider five public interest factors: (1) the local interest in the lawsuit, (2) the court's familiarity with the governing law, (3) the burden on local courts and juries, (4) congestion in the court, and (5) the costs of resolving a dispute unrelated to a particular forum. *Lueck*, 236 F.3d at 1147.

Reynolds makes much of the first factor, showing magnanimous concern that "an American jury—culturally and politically remote from the Philippines—should pass judgment on the social, political and economic issues that are implicated by plaintiff's claims." The backhanded indictment of the jury

---

[9]On appeal, Reynolds offered to satisfy any judgment in the Philippines. This offer was not before the district court and it comes too late to be factored into our analysis of the district court's exercise of its discretion.

system is not compelling. Juries routinely address subjects that are totally foreign to them, ranging from the foreign language of patent disputes to cases involving foreign companies, foreign cultures and foreign languages. Tuazon resides in Washington, which has a strong interest in ensuring the welfare of its residents, U.S. citizens and non-citizens alike. *Piper Aircraft*, 454 U.S. at 257. No doubt the Philippines also has an interest in the alleged conspiracy and its effect on public health. This equipoise of interests favors neither jurisdiction. However, with this interest factor, we ask only if there is an identifiable local interest in the controversy, not whether another forum also has an interest.

The second public interest factor concerns the choice of law that will govern Tuazon's substantive claims. Both parties seem to believe that Philippine law will apply. We need not say now whether it does—the choice of law inquiry is better left to the district court. An analysis of Philippine law, assuming it applies, would be a burden and would support dismissal, as the district court acknowledged. This fact alone is not, however, determinative. *Piper Aircraft*, 454 U.S. at 260 n.29 (holding that the need to apply foreign law "alone is not sufficient to warrant dismissal").

**[22]** All the other public interest factors favor Washington as a forum. The district court noted it had the resources to hear Tuazon's case and "is not overburdened or congested." *Cf. Bhatnagar*, 52 F.3d at 1225 ("Given the incentives that press our district courts to reduce their caseload, we should take particular care before second-guessing a district court that rejects a forum non conveniens motion after considering the factors that we and the Supreme Court have deemed relevant."). The district court also found that there will be no cost in resolving a case unrelated to the forum—the case is related to Washington because Tuazon resides there. Reynolds' briefing offers no comment on these three factors and nothing in the record supports reversal of the district court's determination that the public interest factors favor Washington. Reyn-

olds has not met its burden to overcome Tuazon's choice of Washington as the forum for his lawsuit.

## Conclusion

In this global and mobile age, we should expect to face controversies arising from activities originating in the United States but played out in distant lands. We should also expect to face more frequently difficult jurisdictional issues based on complicated cross-border factual scenarios. Nonetheless, Tuazon's claim represents an application of settled principles of personal jurisdiction. The debate over whether the public and private factors favor the Philippines or Washington as a forum is intensely fact-specific. Our role is not to second guess the district court's conclusions when the record supports its analysis of the forum non conveniens factors. The district court did not abuse its discretion in determining that these factors favored keeping the case in Washington.

**AFFIRMED.**